[This decision has been published in *Ohio Official Reports* at 91 Ohio St.3d 220.]

THE STATE OF OHIO, APPELLEE, *v*. JALOWIEC, APPELLANT.

[Cite as *State v. Jalowiec*, 2001-Ohio-26.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(No. 98-1074—Submitted November 14, 2000—Decided April 4, 2001.)

APPEAL from the Court of Appeals for Lorain County, No. 96CA006445.

_____

**PFEIFER, J.**

{¶ 1} On the morning of January 19, 1994, a partially clad male body was found in Woodland Cemetery in Cleveland. Two weeks later, the body was identified as that of Ronald Lally of Elyria. Over a year later, the grand jury indicted defendant-appellant, Stanley E. Jalowiec, for aggravated murder, with firearm and death-penalty specifications. The indictment alleged that Jalowiec purposely killed Lally to prevent him from testifying in criminal proceedings, which had been scheduled to begin on January 19, 1994. Subsequently, a jury found Jalowiec guilty as charged, and he was sentenced to death.

{¶ 2} In June 1993, Ron Lally contacted the Elyria police to volunteer as a police informant. Lally signed an agreement to become a confidential informant for the Elyria police and agreed to make controlled drug buys. On June 7, 1993, with the assistance of Officer Scott Ashley and Detective Alan Leiby, Lally made a controlled drug buy of crack cocaine from Danny Smith and his father Raymond Smith while wired with a hidden monitoring device. As a result of the controlled buy, police arrested both Raymond Smith and Danny Smith in August 1993 and charged them with aggravated drug trafficking. Both cases were eventually set for trial on January 19, 1994.

{¶ 3} On January 18, 1994, the evening before the murder, Brian Howington and Jalowiec went to several bars in downtown Elyria. (Howington

knew Jalowiec because Jalowiec used to visit Howington's aunt, Joann Corrine Fike, when Howington lived with her.) Jalowiec then asked Howington to accompany him to a friend's house on Middle Avenue. There, Howington met Ron Lally and his roommate, and the four of them smoked crack cocaine. Around 11:30 p.m., Jalowiec, Howington, and Lally went to Fike's house and "[s]hot pool, partied some more."

{¶ 4} About an hour later, Jalowiec got a page and asked Howington if he could borrow Fike's car, a Chrysler LeBaron convertible. Though Howington was hesitant, he relented after Jalowiec persisted. Around 1:00 a.m., Jalowiec and Lally left Fike's house in the LeBaron. The next time Howington saw the car was around 5:00 a.m. when Jalowiec and Raymond Smith returned it to Fike's apartment. At that time, the car was covered with ice, and Jalowiec and Smith told Howington that the car had been washed. Fike testified that Jalowiec told her that he had washed the car because there was blood on it as a result of a fight he had had with someone at Mom's Open Kitchen.

{¶ 5} Sharon Hopkins testified that she was at Razzle's bar in Elyria one night in January 1994 with her brother, Terry Hopkins, Raymond Smith, Danny Smith, Michael Smith (another son of Raymond), and several others, including Jalowiec. The group stayed at Razzle's until it closed and then, without Jalowiec, went to eat at Mom's Open Kitchen until around 2:45-3:00 a.m.

{¶ 6} After leaving Mom's, Sharon Hopkins rode in Danny Smith's car with several people including Raymond, Danny, and Michael Smith. They traveled on Middle Avenue past the railroad tracks just outside the Elyria city limits and dropped Raymond and Michael Smith off by a wooded area. They drove back over the tracks and pulled into a parking lot. Approximately five to ten minutes later, a convertible drove over the tracks to where they had dropped off Raymond and Michael Smith. Danny Smith said, "That is it."

{¶ 7} Several minutes later, the convertible drove by again heading toward town, and Danny Smith's car began to follow it. Shortly thereafter, Danny Smith signaled the convertible to pull over and ducked down in the front passenger seat while telling Sharon Hopkins to get out and ask the people in the convertible whether they had picked up Michael Smith. Sharon Hopkins saw Jalowiec get out of the driver's seat of the convertible. Jalowiec responded that Michael Smith was in the car. Although Sharon Hopkins could not see the other occupants, she could tell that there were four people inside the convertible. Danny Smith then drove Sharon Hopkins home.

{¶ 8} Later that morning, at around 3:30-4:00 a.m., Danny Smith arrived back at his apartment. Terry Hopkins arrived a little later and noticed that Danny Smith was "nervous and said he was feeling sick to his stomach." Danny Smith told Hopkins that "they had done it, they did it." Hopkins then went back to his sister's apartment across the street from Danny Smith's apartment. Later, Hopkins visited Danny Smith again and also saw Jalowiec, Raymond Smith, and Michael Smith. Jalowiec said, "They stomped him and ran him over with a car." The others there indicated that "they shot him and cut him." According to Hopkins, they were "[k]ind of like bragging about it." Danny Smith told Hopkins they wanted this person killed because he had worn "a wire on him on a drug sale."

{¶ 9} At approximately 9:55 a.m. on January 19, 1994, Cleveland homicide detective Michael Beaman was summoned to Woodland Cemetery. A male body had been found on a cemetery roadway. Some of the victim's clothing was nearby in a snow bank. There was no identification on or near the victim and police did not learn the identity of the victim, Lally, until a few weeks later.

{¶ 10} Dr. Heather Raaf, a forensic pathologist with the Cuyahoga County Coroner's Office, performed the autopsy on Lally. Dr. Raaf testified that teeth in Lally's mouth had been knocked out by a gunshot. Dr. Raaf estimated that Lally had sustained at least eleven blows to his head and that his injuries were consistent

3

with being stomped or struck by a vehicle several times. Dr. Raaf determined that Lally's death resulted from a gunshot wound to the head and multiple blunt impacts to the head.

{¶ 11} The drug trafficking cases against Danny and Raymond Smith were subsequently dismissed because Lally, the primary witness in both cases, was dead.

{¶ 12} After an extensive police investigation, the grand jury indicted Jalowiec on March 8, 1995, for aggravated murder with a firearms specification. In addition, a death-penalty specification alleged that Jalowiec purposely killed Lally in order to prevent his testimony as a witness in a criminal proceeding.

{¶ 13} At trial, the key witness for the prosecution was Michael Smith, son of Raymond Smith[1] and brother of Danny Smith. Michael Smith contacted Detective Leiby in April 1994 because he was bothered about having witnessed the Lally murder. During Raymond Smith's murder trial, Michael Smith had been unavailable to testify, and the prosecution proffered testimony from him that had been elicited in a deposition. *State v. Smith* (2000), 87 Ohio St.3d 424, 428, 721 N.E.2d 93, 102. However, at Jalowiec's trial, Michael Smith testified as a prosecution witness.

{¶ 14} Michael Smith testified that, purely by chance, he had met his father and brother at Mom's Open Kitchen around 2:30 a.m. on the night of the murder. Raymond Smith had made a phone call and indicated to Michael Smith that he was going to leave. Michael agreed to go with his father and left with him and his brother, Danny Smith. The Smiths and Danny Smith's girlfriend got in Danny Smith's car and both Raymond and Michael Smith were dropped off on Middle Avenue. Raymond and Michael waited outside in the cold, even though Michael had no idea what they were waiting for. The LeBaron driven by Jalowiec with Lally as a passenger pulled up to them and stopped. Raymond Smith told Lally to

---

1. We affirmed the death sentence of Raymond Smith in *State v. Smith* (2000), 87 Ohio St.3d 424, 721 N.E.2d 93.

get in the back seat, and Michael Smith got in the back seat on the driver's side. Raymond Smith sat in the passenger side front seat and made introductions.

{¶ 15} Shortly thereafter, Raymond Smith brandished a gun and told Lally, "Don't make any sudden moves." The group stopped to buy gas, beer, and cigarettes, then drove on Route 2 toward Cleveland. Raymond Smith asked Lally, "Why did you set my son up?" Lally denied doing so, but appeared to be scared. Smith then told Lally, "We are going to give you some money, get you a bus ticket, you are going to get out of town."

{¶ 16} During the trip into Cleveland, all four men were smoking crack cocaine. Lally agreed to leave town, and they drove to East Cleveland to buy some crack for Lally's trip. However, they saw police cars and fire trucks in the neighborhood and decided to drive back towards downtown Cleveland. As they drove, Raymond Smith directed Jalowiec to pull the LeBaron into a Cleveland cemetery.

{¶ 17} Inside the cemetery, Raymond Smith got out of the car, put the gun to Lally's face, and ordered him out of the car. He then told Lally, "You will never snitch on nobody again." Michael Smith heard a gunshot and then heard Lally exclaim: "You shot me in my head, you shot me in my head." Raymond then told Michael and Jalowiec to get out and assist him. Jalowiec got out of the car, but Michael remained inside the car and did not look out. He heard "thumps like hitting" and heard Lally plead, "I won't tell nobody, please don't kill me, please don't kill me."

{¶ 18} Michael Smith testified that after about two to five minutes of quiet, he could tell that the trunk had been opened and that his father and Jalowiec were trying to put something in the trunk. He heard someone say, "He ain't going to fit, * * * he is too stiff," then he heard something drop. Then Raymond Smith and Jalowiec got back in the car, and Jalowiec started the car and put it in reverse. According to Michael Smith, when Lally's body stopped the car from going any

further, Jalowiec drove forward a short distance and then put the car into reverse. Michael Smith could feel the car hit something. Jalowiec did this three times and then drove out of the cemetery.

{¶ 19} As they drove from the cemetery, Raymond Smith began arguing with Michael Smith: "This is for your brother, why didn't you get out and help?" While driving back to Elyria, Raymond took his gun apart and threw it out the window, piece by piece. Upon arriving in Elyria, they dropped Michael Smith off at Danny Smith's apartment.

{¶ 20} Linda Luke, a forensic serologist in the coroner's office, conducted tests on stains found on the trunk liner of the Chrysler LeBaron. Luke testified that the DNA in Lally's blood sample was consistent with the blood found on the trunk liner.

{¶ 21} After deliberation, the jury found Jalowiec guilty as charged.

{¶ 22} At the mitigation hearing, Jalowiec made an unsworn statement. Other witnesses also testified on Jalowiec's behalf, including his former live-in girlfriend and several family members, including both of his parents. The prosecution presented seven witnesses in rebuttal.

{¶ 23} The jury recommended death, and the court sentenced Jalowiec to death. The court of appeals affirmed the convictions and death sentence. The cause is now before this court upon an appeal as of right.

{¶ 24} Jalowiec has raised thirteen propositions of law. (See appendix.) We have reviewed each and have determined that none justifies reversal of appellant's conviction for aggravated murder. We have also independently weighed the aggravating circumstance against the mitigating factors and reviewed the death penalty for appropriateness and proportionality. For the reasons that follow, we affirm appellant's convictions and death sentence.

VOIR DIRE ISSUES

{¶ 25} *Defendant in Shackles.* In Proposition of Law IV, Jalowiec argues that his conviction must be reversed because the trial court failed to remedy or address the issue of prospective jurors' viewing him in shackles during voir dire. Jalowiec relies on *Holbrook v. Flynn* (1986), 475 U.S. 560, 568-569, 106 S.Ct. 1340, 1345-1346, 89 L.Ed.2d 525, 534, for the proposition that due process is violated when jurors view restraints on a defendant absent some essential state interest. Jalowiec further asserts that both the court and the prosecutor displayed a "cavalier attitude" to the incident.

{¶ 26} Defense counsel brought the matter to the court's attention at the beginning of voir dire, stating, "[T]here were several potential jurors standing in the hall going to and out of the restrooms and they did see Mr. Jalowiec handcuffed." Defense counsel moved for a mistrial. The prosecutor suggested that some sort of voir dire should take place before the court ruled on the motion. The trial court overruled the mistrial motion and told defense counsel: "Certainly you have the opportunity to inquire of the prospective jurors as to whether or not they have been prejudiced because of this, okay?"

{¶ 27} In his original brief to the court of appeals, Jalowiec did not raise this issue. Subsequently, defense counsel filed a lengthier brief to proffer issues they would have raised had the court granted their motion to exceed the page limit. The court of appeals ordered it stricken. Within the stricken brief, Jalowiec raised the issue that prospective jurors observed shackles on him. We conclude that this issue was waived because it was not properly raised before the court of appeals. *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph two of the syllabus.

{¶ 28} Additionally, we conclude that Jalowiec has failed to demonstrate prejudicial error. Defense counsel asserted that some prospective jurors saw Jalowiec handcuffed, but never followed up on it. The court suggested that defense

counsel use voir dire to discover any possible prejudice, but counsel failed to do so. Thus, no prejudice is demonstrated on the record.

{¶ 29} Even if some potential jurors saw Jalowiec handcuffed on the first day of voir dire, the danger of prejudice to Jalowiec was slight, since the juror's view of Jalowiec in custody was brief, inadvertent, and outside the courtroom. See *State v. Kidder* (1987), 32 Ohio St.3d 279, 285-286, 513 N.E.2d 311, 318; and *State v. Landrum* (1990), 53 Ohio St.3d 107, 118, 559 N.E.2d 710, 724. See, also, *State v. Richey* (1992), 64 Ohio St.3d 353, 358, 595 N.E.2d 915, 921. Finally, nothing in the record suggests that the court or prosecutor treated this matter with a "cavalier attitude." Accordingly, we reject Proposition of Law IV.

{¶ 30} *Improper Exclusion of Jurors.* In Proposition of Law VI, Jalowiec argues that he was deprived of a fair trial and an impartial jury because several jurors were improperly excused based on their views of the death penalty. Specifically, Jalowiec claims that the court improperly excluded prospective jurors Porter, Eubanks, Kowalski, Fobell, and Buck.

{¶ 31} In the court of appeals, Jalowiec raised the issue of improper excusal only for prospective jurors Porter and Eubanks. Therefore, Jalowiec has waived claims of error concerning Kowalski, Fobell, and Buck. *Williams,* 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph two of the syllabus.

{¶ 32} Prospective juror Porter questioned the ability of anyone to impose a death sentence, based on the Bible. She first indicated that she could not consider death as a sentencing option. Porter later said several times, unequivocally, that she could vote for a death sentence but then said she could not sign a death warrant. The trial court did not abuse its discretion in excusing Porter, since her views on the death penalty would have substantially impaired her performance as a juror. *State v. Rogers* (1985), 17 Ohio St.3d 174, 17 OBR 414, 478 N.E.2d 984, paragraph three of the syllabus.

{¶ 33} Prospective juror Eubanks initially indicated that he could "probably" sign a death verdict. Upon further questioning, he equivocated, then indicated that his death-penalty views would substantially impair his ability to fairly consider a death sentence, then equivocated again. The excusal for cause of prospective juror Eubanks was not an abuse of discretion.

{¶ 34} Based on the foregoing, we reject Proposition of Law VI.

GUILT-PHASE ISSUES

{¶ 35} *Coconspirators' Extrajudicial Statements.* In the first part of Proposition of Law I, Jalowiec argues that under *Bruton v. United States* (1968), 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476, he was prejudiced and denied his right to confront and cross-examine witnesses when the prosecutor mentioned during opening statement that Raymond Smith had implicated Jalowiec in the Lally murder. While Jalowiec concedes that counsel failed to object to the statement, he asserts that it was plain error under *Bruton*.

{¶ 36} Jalowiec's failure to object waived all but plain error. See, *e.g.*, *State v. Slagle* (1992), 65 Ohio St.3d 597, 604, 605 N.E.2d 916, 925. In addition, the issue was not raised before the court of appeals. *Williams,* 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364.

{¶ 37} The prosecutor's brief reference to Raymond Smith's statement did not constitute plain error. It does not appear that "but for the error, the outcome of the trial clearly would have been otherwise." *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus. The trial court instructed the jury at the outset that opening statements are not evidence. Unlike the situation in *Bruton*, the statement in issue was not elicited during testimony. The remark, which was not even objected to, did not deny Jalowiec a fair trial. See *State v. Wade* (1978), 53 Ohio St.2d 182, 7 O.O 3d 362, 373 N.E.2d 1244, paragraph one of the syllabus. Accordingly, we reject this portion of Proposition of Law I.

**{¶ 38}** Under Proposition of Law II, Jalowiec asserts that the state failed to make a prima facie case of a conspiracy in the Lally murder independent of out-of-court statements by alleged coconspirators. Therefore, he contends that the court erred in failing to exclude, over defense objections, several out-of-court statements made by Danny Smith.

**{¶ 39}** The trial court overruled Jalowiec's objections, based on Evid.R. 801(D)(2), which provides that hearsay does not include "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy upon independent proof of the conspiracy." We recognized in *State v. Carter* (1995), 72 Ohio St.3d 545, 651 N.E.2d 965, paragraph three of the syllabus, that "[t]he statement of a co-conspirator is not admissible pursuant to Evid.R. 801(D)(2)(e) until the proponent of the statement has made a prima facie showing of the existence of the conspiracy by independent proof." See, also, *State v. Lindsey* (2000), 87 Ohio St.3d 479, 481, 721 N.E.2d 995, 1000-1001.

**{¶ 40}** Independent evidence established that a conspiracy to kill Lally existed on the night of his murder based on the testimony of Michael Smith and on Sharon Hopkins's and Howington's testimony that Jalowiec arranged to get Lally in the car with Raymond Smith. Sharon Hopkins testified about events that occurred within hours of the murder, including where she was with Raymond, Danny, and Michael Smith, and that she heard from Jalowiec that Michael Smith was in the LeBaron. Brian Howington testified that he was with Jalowiec and Lally on the night of the murder, and that Jalowiec and Lally left in the LeBaron around 1:00 a.m. Michael Smith's testimony implicated Jalowiec, Raymond Smith, and Danny Smith in the Lally murder. Michael Smith confirmed that Jalowiec, Raymond Smith, and Danny Smith made arrangements to get Lally into the car, before Lally would have a chance to testify against them.

**{¶ 41}** Evidence at trial also indicated that the conspiracy began as early as September 15, 1993. Lally told Elyria police officer Homoki at Mr. Hero's in

Elyria that both Jalowiec and Danny Smith had threatened him. This occurred a month after Raymond Smith and Danny Smith had been arrested as a result of Lally's controlled drug buy. While at Mr. Hero's, Lally told Officer Homoki that "these individuals" had threatened his life because he was going to testify against them. Danny Smith had also pointed to Lally at that time and said: "That snitch will get his."

{¶ 42} Accordingly, the following statements by Danny Smith were made in the course of, and in furtherance of, the conspiracy. Lynne Altpater testified that Danny Smith asked her, about a month before Lally's murder, for some poison for someone who was "going to testify against him." Carl Hartman testified that in November 1993, Danny Smith offered him a BMW and cash to make sure "Ron didn't make it to the stand," but when Hartman refused, Danny Smith told him that "Stanley and his dad" would do it for him.

{¶ 43} Sandra Williams testified that Danny Smith told her that "it would be a shame if anything happened to [Lally's] family" or to her. He also said that he knew that Lally's family "lived in a trailer and it would be a shame if it got blowed up." Testimony about threats is not hearsay. Evid.R. 801(C) and Comment.

{¶ 44} Terry Hopkins testified that on the morning of the murder, Danny Smith told him "they did it" and that Jalowiec told him, "They stomped him and ran him over with a car." Further, he testified that Jalowiec and Raymond and Danny Smith were "[k]ind of like bragging about" murdering Lally and that Danny Smith stated that he wanted the person killed because "he had wore a wire on him on a drug sale." Testimony of bragging by the Smiths tended to implicate them, not Jalowiec, and thus was harmless, even if not admissible as statements against interest or statements of coconspirators.

{¶ 45} We find that the prosecution established a prima facie case of conspiracy. The early admission of statements that could have been deemed

hearsay at the time they were elicited was rendered harmless, since independent proof of the conspiracy was admitted into evidence before the case was submitted to the jury. *Carter,* 72 Ohio St.3d at 550, 651 N.E.2d at 972; see, also, *Smith,* 87 Ohio St.3d at 433-435, 721 N.E.2d at 106-107. We reject Proposition of Law II.

**{¶ 46}** *Sufficiency of Evidence.* In Proposition of Law III, Jalowiec contends that the trial court erred in failing to grant his motion for acquittal under Crim.R. 29. Specifically, Jalowiec asserts that there was no evidence that any element of the crime was committed in Lorain County and that venue in Lorain County was therefore improper. Jalowiec also argues that there was insufficient evidence to prove prior calculation and design.

**{¶ 47}** When reviewing a claim of insufficient evidence, the relevant inquiry is whether any rational factfinder, viewing the evidence in a light most favorable to the state, could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.E.2d 560, 573; *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. The verdict will not be disturbed unless the reviewing court finds that reasonable minds could not reach the conclusion reached by the trier of fact. *Id.* at 273, 574 N.E.2d at 503.

**{¶ 48}** With regard to Jalowiec's claim of improper venue, we held in *State v. Beuke* (1988), 38 Ohio St.3d 29, 526 N.E.2d 274, paragraph one of the syllabus: "When an offender commits offenses in different jurisdictions as part of a course of criminal conduct, venue lies for all the offenses in any jurisdiction in which the offender committed one of the offenses or any element thereof. (R.C. 2901.12[H].)" Venue is not a material element of any crime but is a fact that must be proven beyond a reasonable doubt. *State v. Headley* (1983), 6 Ohio St.3d 475, 477, 6 OBR 526, 528, 453 N.E.2d 716, 718. However, R.C. 2901.12(G) provides: "When it appears beyond a reasonable doubt that an offense or any element of an offense was committed in any of two or more jurisdictions, *but it cannot reasonably*

12

*be determined in which jurisdiction the offense or element was committed, the offender may be tried in any such jurisdiction.*" (Emphasis added.)

{¶ 49} The testimony by Officer Homoki concerning the threats made to Lally by Jalowiec and Danny Smith and the events culminating in Lally's being taken out of Lorain County with Jalowiec and Raymond and Michael Smith indicate that a conspiracy had been formed prior to the murder. The evidence shows that those events were orchestrated and supports the prosecution's claim that prior calculation and design occurred in Lorain County.

{¶ 50} Michael Smith testified that after he and his father got in the LeBaron driven by Jalowiec, Raymond Smith brandished a gun and told Lally not to make any sudden moves. As they drove toward Cleveland, Raymond Smith repeatedly asked Lally why he "set my son up."

{¶ 51} Yet Michael Smith also testified that Smith told Lally that they were going to put him on a bus to leave town and that "everything got a little more comfortable" in the car while the four of them drank beer and smoked crack. Michael Smith testified that they drove to East Cleveland to buy crack for Lally to take on his trip. Although this evidence could be considered to somewhat negate the state's argument that prior calculation and design was formed in Lorain County, the trier of fact could have concluded that the conspirators were simply engaged in a subterfuge to relax Lally.

{¶ 52} Subsequently, Raymond Smith directed the car into Woodland Cemetery in Cleveland and told Lally: "You will never snitch on nobody again." After Raymond Smith shot Lally, Jalowiec got out of the car and helped him beat Lally. After leaving Lally in the cemetery road, Jalowiec attempted to drive the LeBaron over Lally's body several times.

{¶ 53} In our view, the evidence at trial indicated that the whole sequence of events leading up to Lally's murder, including prior calculation and design, occurred in both Lorain and Cuyahoga Counties. As was true in the case involving

Jalowiec's coconspirator, see *State v. Smith*, 87 Ohio St.3d at 435-436, 721 N.E.2d at 107-108, the jury could have reasonably found that prior calculation and design by Jalowiec took place in Lorain County. As in *Smith,* the jury could have reasonably concluded that getting Lally in the car ostensibly to ride to Cleveland to buy crack, as well as the plan to have Lally take a bus out of town, was merely a ruse to enable them to kill him in an area where his corpse could not be identified. In sum, we find that the trial court did not err in denying Jalowiec's Crim.R. 29 motion for acquittal on grounds of improper venue or in failing to demonstrate prior calculation and design. Therefore, we reject Proposition of Law III.

{¶ 54} *Gruesome Photographs.* In Proposition of Law XI, Jalowiec asserts error in the admission of gruesome, prejudicial, and cumulative photographs.

{¶ 55} Under Evid.R. 403, the admission of photographs and similar evidence is left to the sound discretion of the trial court. *State v. Maurer* (1984), 15 Ohio St.3d 239, 264, 15 OBR 379, 401, 473 N.E.2d 768, 791. Nonrepetitive photographs in capital cases, even if gruesome, are admissible if the probative value of each photograph outweighs the danger of material prejudice to the accused. *Id.* at paragraph seven of the syllabus.

{¶ 56} Jalowiec does not specify that any particular photographs were cumulative. He merely argues that since there was no dispute as to the cause of death, the gruesome photographs, as a whole, were inadmissible. However, "[t]he fact that appellant stipulated the cause of death does not automatically render the photographs inadmissible." *Maurer,* 15 Ohio St.3d at 265, 15 OBR at 401, 473 N.E.2d at 792.

{¶ 57} State exhibits 1-A through 1-Q are photographs of the crime scene where Lally's body was discovered. Several were admitted into evidence without objection. State exhibits 1-G and 1-I through 1-M were admitted over defense objections. Any alleged error in the admission of the photographs that were not objected to is waived.

{¶ 58} Of the seventeen crime scene photographs, only three appear to be grisly. Each of these photographs corroborated the testimony of Cleveland detective Michael Beaman, who investigated the Lally homicide on the extremely cold morning of January 19, 1994. These photographs also helped to establish the intent of the killers and the "nature and circumstances of the crimes." *State v. Reynolds* (1998), 80 Ohio St.3d 670, 677, 687 N.E.2d 1358, 1367. State exhibit 1-F shows the victim lying face down on the cemetery road with a wound to his left shoulder. State exhibit 1-G, which the court warned the jury was gruesome, shows the victim's face covered with blood and snow and a large wound on his neck. State exhibit 1-H depicts Lally's chest covered with blood.

{¶ 59} The other crime scene photographs show various items of evidence found at the scene. State exhibits 1-L and 1-M depict tire tracks running through a large bloodstain. The photographs also corroborate the testimony of Michael Smith, who was a witness to the murder. Four photographs showing the body lying across the road are repetitive but are not gruesome, so there is no prejudice. None of the rest of these crime scene photographs is repetitive.

{¶ 60} State exhibits 2-A through 2-CC are twenty-seven photographs taken around the time of Lally's autopsy.[2] Jalowiec objected to the admission of all autopsy photographs because of their gruesome and repetitive nature. The trial court overruled his objections and admitted them into evidence.

{¶ 61} Admittedly, several of these photographs are gruesome. Each one corroborates the testimony of Dr. Raaf, who performed the autopsy on Lally. The cumulative effect of several repetitive autopsy photographs was harmless. In addition, the photographs illustrated the extent of the beating that Lally sustained and the attempts made by Jalowiec to run over his body with a car, and the photographs were relevant by illustrating witness testimony and forensic evidence.

---

2. There are no photographs in the record marked state exhibits 2-D or 2-V.

*Maurer,* 15 Ohio St.3d at 265-266, 15 OBR at 401-402, 473 N.E.2d at 791-792. Accordingly, we overrule Proposition of Law XI.

{¶ 62} *Jury Instructions.* In Proposition of Law XIII, Jalowiec argues that it was impossible to reconcile the specific-intent requirement of former R.C. 2903.01(D), 139 Ohio Laws, Part I, 3-4, and the charge given to the jury. He asserts that the overall jury charge was so confusing that one simply cannot find that the jury was clearly instructed. However, Jalowiec's failure to object to the instruction waived all but plain error.

{¶ 63} The portion of the jury charge that Jalowiec claims is in conflict with former R.C. 2903.01(D) provided:

" 'Cause' is an essential element of the offense charged in Count One.

" 'Cause' is an act, or a failure to act, which in the natural and continuous sequence directly produces the death, and without which it would not have occurred.

" 'Cause' occurs when the death is the natural and foreseeable result of the act, or the failure to act.

"The Defendant's responsibility is not limited to the immediate or most obvious result of the Defendant's act, or failure to act.

"The Defendant is also responsible for the natural and foreseeable consequences or results that follow, in the ordinary course of events, from the act or failure to act."

{¶ 64} We have stated that "[a] single instruction to a jury may not be judged in artificial isolation but must be viewed in the context of the overall charge." *State v. Price* (1979), 60 Ohio St.2d 136, 14 O.O.3d 379, 398 N.E.2d 772, paragraph four of the syllabus. Here, the overall charge indicated that the jury was required to find specific intent to kill and prior calculation and design before it could convict Jalowiec of aggravated murder. The instruction on foreseeable consequences does not constitute  error, let alone plain error, since other

instructions given by the court limited any prejudicial effect. *State v. Getsy* (1998), 84 Ohio St.3d 180, 196, 702 N.E.2d 866, 883. Accordingly, Proposition of Law XIII is overruled.

## SENTENCING ISSUES

**{¶ 65}** *Rebuttal Testimony.* In Proposition of Law XII and in the second part of Proposition of Law I, Jalowiec asserts that he was prejudiced by the state's presentation of rebuttal witnesses during the mitigation phase. Jalowiec contends that under the guise of rebuttal, the state presented numerous witnesses who testified as to other crimes committed by Jalowiec. Jalowiec submits that this testimony was essentially evidence of nonstatutory aggravating circumstances.

**{¶ 66}** At the mitigation hearing, Jalowiec gave an unsworn statement, during which he also responded to questions from defense counsel. During his unsworn statement, Jalowiec chronicled his problems with rheumatoid arthritis, its effects on him, and how it prevented him from holding a job for very long. He spoke about the relationship he had with the children of his girlfriend and how he had developed a father-son relationship with her son, Derrick. Jalowiec denied being involved with threatening or wanting to kill Lally, stating, "I had nothing to do with this." He also denied having a crack problem and asserted that there were no pending drug cases against him.

**{¶ 67}** At that point, away from the jury, the defense indicated that it was going to rest if the trial court thought it had not opened the door for rebuttal by the prosecution. The court overruled the defense motion to prevent rebuttal by the state on the grounds that Jalowiec had brought out a character trait, that "[h]e is a great guy," that could be rebutted under Evid.R. 404(A)(1), in particular with evidence of prior crimes of violence.

**{¶ 68}** After this, the court permitted Jalowiec to continue with his unsworn statement. Jalowiec then admitted that he had pending charges brought against him for felonious assault, menacing, arson, aggravated drug trafficking, and possessing

drug paraphernalia. The first three charges related to bar fights in which Jalowiec was involved, but he denied any guilt. With regard to the charges of drug trafficking, Jalowiec claimed that he did not "know, really know, what this is all about" and further claimed that the drug charges had been brought in an attempt to compel him to testify against others in the homicide investigation.

{¶ 69} The defense then called a number of other witnesses, including relatives, who testified that Jalowiec was "great" with children, that he fainted at the sight of blood, that he "loved kids," that he would not go hunting and "wouldn't kill a thing," that he did not start the bar fight that led to the menacing charge or fight back, and that he was a "fun loving kid" who "loved animals" and loved kids and people.

{¶ 70} In response, the state produced seven rebuttal witnesses who testified that Jalowiec sold crack cocaine, that he had a crack pipe that fell out of his pants leg when he was pulled over on a traffic stop, that he hit someone with a baseball bat outside a bar, causing almost $20,000 in medical bills to the victim, that he bragged about kicking the same bar-fight victim in the face, and that he caused injuries to another victim of the same bar fight, resulting in hospitalization and $10,000 worth of medical bills.

{¶ 71} In *State v. Gumm* (1995), 73 Ohio St.3d 413, 653 N.E.2d 253, syllabus, we held that "counsel for the state at the penalty stage of the capital trial may introduce * * * (3) evidence rebutting the existence of any statutorily defined or other mitigating factors first asserted by the defendant." Accord *State v. Raglin* (1998), 83 Ohio St.3d 253, 261, 699 N.E.2d 482, 490.

{¶ 72} Here, Jalowiec denied knowledge of any legitimate basis as to why particular drug trafficking charges had been brought against him. He called several witnesses to testify about what a good person he was.

{¶ 73} The trial court has discretion to determine what relevant evidence is admissible as proper rebuttal. *State v. Dunlap* (1995), 73 Ohio St.3d 308, 316, 652

N.E.2d 988, 996. In discharging its burden to prove that the aggravating circumstance outweighs the mitigating factors, the prosecution may rebut mitigation evidence. *State v. DePew* (1988), 38 Ohio St.3d 275, 285-286, 528 N.E.2d 542, 554.

{¶ 74} Similar to the situation in *State v. McNeill* (1998), 83 Ohio St.3d 438, 446-447, 700 N.E.2d 596, 605-606, Jalowiec opened the door to rebuttal. This rebuttal evidence tended to show that Jalowiec was capable of strenuous physical activity, that he sold drugs, and that he severely beat victims in the bar fights that led to the charges against him. The trial court did not err in permitting the prosecution to rebut Jalowiec's unsworn statement or witnesses. The rebuttal testimony did not amount to the introduction of nonstatutory aggravating circumstances. See *Gumm,* 73 Ohio St.3d 413, 653 N.E.2d 253, syllabus.

{¶ 75} Jalowiec argues under the second part of Proposition of Law I that the out-of-court statements of Raymond Smith, which were elicited during the rebuttal testimony of Detective Alan Leiby in the mitigation phase, prejudiced him. Jalowiec also contends that the trial court improperly admitted two taped confessions of Smith, the second one implicating Jalowiec, at the mitigation phase.

{¶ 76} During his unsworn statement, Jalowiec testified, "I had no reason to kill that man." He stated, "Detective Leiby specifically set me up and he made some comments in the newspaper, to the Chronicle, and one of the comments was that it was impossible for him to get 15 people to lie against us." Jalowiec also stated, "I really didn't have nothing to do with this, that it was a family thing and I am not part of the Smith family."

{¶ 77} In rebuttal, Detective Leiby testified that Raymond Smith told him on the telephone that Jalowiec was involved in the Lally murder. Smith was trying to help his son Danny Smith work out a deal to avoid six counts of drug trafficking. Smith gave a taped statement at police headquarters describing the events leading up to Lally's death at the cemetery. He claimed that Lally had the gun and that

Lally had kidnapped him. He did not mention Jalowiec's name at that time. Later, Smith phoned Detective Leiby and told him that the other person in the cemetery was Jalowiec.

{¶ 78} Given the case law cited in our discussion of Proposition of Law XII, *DePew* and *McNeill, supra,* Jalowiec's mitigation evidence, especially his denials of involvement in the Lally murder, opened the door to this rebuttal evidence.

{¶ 79} However, the admission of the two taped statements of coconspirator Raymond Smith was erroneous, since both tapes constituted inadmissible hearsay. Jalowiec's failure to object to their admission waived all but plain error. In this instance, no plain error occurred, since the improper admission of the tapes was not outcome-determinative in light of the abundant evidence presented against Jalowiec. Any prejudicial impact this evidence may have had on the sentencing phase can be cured by our independent review of the sentence. *State v. Dennis* (1997), 79 Ohio St.3d 421, 432, 683 N.E.2d 1096, 1106. Therefore, we reject the second part of Proposition of Law I.

{¶ 80} *Sentence Appropriateness.* In Proposition of Law VII, Jalowiec challenges the appropriateness of his death sentence. The appropriateness of this sentence will be evaluated in connection with our independent sentence evaluation.

{¶ 81} *Proportionality Review.* In Proposition of Law VIII, Jalowiec argues that the proportionality review that we conduct is not the one established in R.C. 2929.05 and is fatally flawed, since it does not include cases where a life sentence was imposed. We disagree. Proportionality review entails comparing only cases where a sentence death is imposed. *State v. Steffen* (1987), 31 Ohio St.3d 111, 123-124, 31 OBR 273, 284, 509 N.E.2d 383, 395. Accordingly, we reject Proposition of Law VIII.

{¶ 82} *Jury Instructions.* In Proposition of Law IX, Jalowiec criticizes the trial court's penalty-phase jury instructions. Jalowiec essentially argues that the following instruction required that the jury reject the death penalty before it

considered the life sentences, an instruction proscribed in *State v. Brooks* (1996), 75 Ohio St.3d 148, 160, 661 N.E.2d 1030, 1041:

"You should recommend the sentence of death if you unanimously, that is, all twelve of you, find by proof beyond a reasonable doubt, that the aggravating circumstances outweigh the mitigating factors.

"If you do not so find, you shall unanimously (all twelve) recommend either a life sentence with parole eligibility after serving twenty years of imprisonment, or a life sentence with parole eligibility after serving thirty years of imprisonment."

**{¶ 83}** Jalowiec's failure to object to this instruction waived all but plain error. *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus. The instruction does not constitute plain error. See *State v. Bey* (1999), 85 Ohio St.3d 487, 498, 709 N.E.2d 484, 496; *State v. Goff* (1998), 82 Ohio St.3d 123, 128-129, 694 N.E.2d 916, 921-922; *State v. Mitts* (1998), 81 Ohio St.3d 223, 233, 690 N.E.2d 522, 531. Unlike in *Brooks*, 75 Ohio St.3d at 159, 661 N.E.2d at 1040, the jury in this case was not told that it had "to determine unanimously that the death penalty was inappropriate before you can consider a life sentence." Instead, "[t]he jury was free to consider a life sentence even if jurors had not unanimously rejected the death penalty." *State v. Taylor* (1997), 78 Ohio St.3d 15, 29, 676 N.E.2d 82, 95.

**{¶ 84}** Jalowiec complains that the court referred to aggravating circumstances (plural) when he was charged with only one aggravating circumstance. However, the state moved the trial court to correct the transcript because the court reporter had informed the prosecutor that "in computerized transcription, the word circumstance is automatically typed in as circumstances." On June 24, 1997, the trial court granted the state's motion to correct the record. But the transcript itself was not corrected, and the plural appears throughout. The plural noun often has a singular verb, however, corroborating the claim of error in transcription. Moreover, the trial court instructed the jury on only one aggravating

circumstance, and the verdict forms set forth only one aggravating circumstance for the jury to consider.

**{¶ 85}** Jalowiec points out that the trial court erred in instructing the jury on all statutory mitigating factors, including factors that were not relevant. See *State v. Hicks* (1989), 43 Ohio St.3d 72, 77, 538 N.E.2d 1030, 1036, fn. 3, and *State v. DePew*, 38 Ohio St.3d at 289, 528 N.E.2d at 557. This did not, however, constitute plain error. See *Bey,* 85 Ohio St.3d at 498, 709 N.E.2d at 496.

**{¶ 86}** Last, Jalowiec argues that the jury was provided no guidance on how to proceed. Specifically, Jalowiec contends that the court's instruction on weighing essentially compelled a death sentence. The trial court instructed:

"The Prosecutor has the burden to prove, beyond a reasonable doubt, that the aggravating circumstances [*sic*] which the Defendant was found guilty of outweighs the factors in mitigation of imposing the death sentence.

" 'To outweigh' means to weigh more than, to be more important than.

"The existence of mitigating factors does not preclude or prevent the death sentence if the aggravating circumstances [*sic*] outweighs the mitigating factors."

**{¶ 87}** We conclude that the instruction complies with R.C. 2929.03. Based on all the foregoing, we reject Proposition of Law IX.

**{¶ 88}** *Effective Assistance.* In Proposition of Law V, Jalowiec claims that he was denied effective assistance of trial counsel. To gain reversal of a conviction for ineffective assistance, "[f]irst, the defendant must show that counsel's performance was deficient. * * * Second, the defendant must show that the deficient performance prejudiced the defense." *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693. Accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373.

**{¶ 89}** The record does not support a finding that Jalowiec was prejudiced, that is, that there was "a reasonable probability that, were it not for counsel's errors,

the result of the trial would have been different." *Id.* at paragraph three of the syllabus.

{¶ 90} Jalowiec identifies five areas where counsel were allegedly deficient.

{¶ 91} First, Jalowiec complains that "during voir dire counsel failed to rehabilitate favorable jurors and failed to timely object to unfounded challenges by the State." Although Jalowiec does not provide any specific examples or citations to the record, he is apparently referring to the excused jurors mentioned under Proposition of Law VI. As previously discussed, none of the juror excusals challenged in that proposition was improper. Moreover, we have repeatedly held that counsel is in a much better position to determine whether jurors could have been rehabilitated than can a reviewing court. *E.g., Phillips,* 74 Ohio St.3d at 85-86, 656 N.E.2d at 659; *Bradley,* 42 Ohio St.3d at 143, 538 N.E.2d at 381.

{¶ 92} Second, Jalowiec claims that he was prejudiced because counsel failed to object to the admission of his coconspirator's statements on tapes that implicated him in the murder. Defense counsel specifically declined to object to this evidence at the close of the mitigation phase. As discussed under Proposition of Law XII, the admission of the two taped statements of Raymond Smith was improper. Counsel should have objected to these tapes. However, their admission did not affect the outcome of Jalowiec's sentencing determination. *Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus.

{¶ 93} Third, Jalowiec argues that he was prejudiced by counsel's failure to request an expert to assist them in determining the cause of death. The deputy coroner, Dr. Heather Raaf, testified that Lally's injuries were consistent with being stomped or struck by a vehicle several times. On cross-examination, Dr. Raaf stated that she did not find any tire or boot tread markings on Lally's corpse. Because of this, Jalowiec claims that counsel were deficient in failing to request their own expert witness.

{¶ 94} However, Dr. Raaf did not testify that there were no markings on Lally's body; rather, she testified that there were no tread markings found on the body. Had counsel requested an expert on cause of death, the request might not have been granted. The appointment of defense experts is within the sound discretion of the trial court. See *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph four of the syllabus. Jalowiec has failed to demonstrate how such an expert would have aided his defense or that there was a basis for requesting an expert. See *State v. Mason* (1998), 82 Ohio St.3d 144, 150, 694 N.E.2d 932, 943-944. In sum, Jalowiec has not demonstrated how he was prejudiced by counsel's failure to seek expert assistance.

{¶ 95} Fourth, Jalowiec claims deficient representation because counsel (1) failed to object to the instruction on all statutory mitigating factors, (2) failed to object to the lack of a sympathy instruction, (3) failed to object to the instruction on consideration of life sentences, (4) failed to request a definition of the term "mitigation" at the penalty phase, and (5) failed to object to the guilt phase instruction that the "Defendant is charged as a principal offender."

{¶ 96} The decision not to request a sympathy instruction was appropriate, since sympathy is irrelevant to sentencing and no instruction on it need be given. See *State v. Allen* (1995), 73 Ohio St.3d 626, 638, 653 N.E.2d 675, 687. Counsel did not err in failing to object to the instruction supposedly requiring consideration of the death penalty before life sentences, because, as discussed under Proposition of Law IX, the instruction did not violate *Brooks,* 75 Ohio St.3d at 160, 661 N.E.2d at 1041.

{¶ 97} The failure to request an instruction defining the term "mitigation" did not prejudice Jalowiec. The absence of instructions on the concept of mitigation does not violate the Eighth and Fourteenth Amendments to the United States Constitution. *Buchanan v. Angelone* (1998), 522 U.S. 269, 275-277, 118 S.Ct. 757, 761-762, 139 L.Ed.2d 702, 709-710. The instructions here did not foreclose the

jury's consideration of any mitigating evidence, since the court directed the jury to "consider all of the evidence." *Id.,* 522 U.S. at 277, 118 S.Ct. at 762, 139 L.Ed.2d at 710; *Goff,* 82 Ohio St.3d at 131, 694 N.E.2d at 923.

{¶ 98} Counsel's failure to object to the instruction on Jalowiec's being charged as a principal offender was harmless. The court properly defined principal offender as part of the complicity instruction. This case involved the specification of killing to prevent testimony under R.C. 2929.04(A)(8); it did not involve the felony-murder specification of R.C. 2929.04(A)(7), where determination of principal-offender status may be critical. See *State v. Taylor* (1993), 66 Ohio St.3d 295, 612 N.E.2d 316.

{¶ 99} Fifth, Jalowiec contends that counsel were ineffective in permitting the defendant to make an unsworn statement, which resulted in a ruling that the prosecutor could rebut it. However, counsel's decision to have Jalowiec make an unsworn statement did not fall "below an objective standard of reasonable representation." *Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus. Counsel's decision was in the nature of trial strategy. With little mitigating evidence to offer, counsel decided to let Jalowiec speak to the jury in the hope of avoiding the death penalty. We ordinarily refrain from second-guessing strategic decisions made by counsel at trial, even where counsel's strategy was questionable, *State v. Clayton* (1980), 62 Ohio St.2d 45, 49, 16 O.O.3d 35, 37, 402 N.E.2d 1189, 1192, and even though appellate counsel essentially argue that they would have defended differently. *Mason,* 82 Ohio St.3d at 169, 694 N.E.2d at 956.

{¶ 100} Based on the foregoing, we reject Proposition of Law V.

{¶ 101} *Constitutionality.* In Proposition of Law X, Jalowiec argues that Ohio's death-penalty scheme violates both the state and federal Constitutions on numerous grounds. As we have before, we summarily reject these arguments. *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus. See *Jenkins,* 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264; *State v. Sowell* (1988), 39 Ohio

St.3d 322, 336, 530 N.E.2d 1294, 1309; *Steffen,* 31 Ohio St.3d at 125, 31 OBR at 285-286, 509 N.E.2d at 396; *State v. Grant* (1993), 67 Ohio St.3d 465, 483, 620 N.E.2d 50, 69; *Maurer,* 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph six of the syllabus; *State v. Lewis* (1993), 67 Ohio St.3d 200, 206, 616 N.E.2d 921, 926; *State v. Buell* (1986), 22 Ohio St.3d 124, 22 OBR 203, 489 N.E.2d 795; and *State v. Coleman* (1989), 45 Ohio St.3d 298, 308, 544 N.E.2d 622, 633.

INDEPENDENT REVIEW AND PROPORTIONALITY

{¶ 102} In Proposition of Law VII, Jalowiec asserts that his death sentence should be reversed as inappropriate, especially since during mitigation the state was able to introduce evidence of other crimes of which he had been accused. As discussed under Propositions of Law I and XII, Jalowiec opened the door to this rebuttal testimony when he denied his guilt, denied having any drug charges pending against him, and generally portrayed himself as a good person.

{¶ 103} Among other evidence, the testimony that Jalowiec and Danny Smith threatened Lally at the Mr. Hero's restaurant, that Danny Smith secured his father and Jalowiec to ensure that "somebody didn't make it to the stand," and that Jalowiec participated in the murder of Lally to prevent him from testifying in the Smith drug trials, combined to prove the single aggravating circumstance beyond a reasonable doubt. Upon independent assessment, we conclude that the evidence supports beyond a reasonable doubt the aggravating circumstance of R.C. 2929.04(A)(8).

{¶ 104} The nature and circumstances of the offense provide nothing in mitigation. Jalowiec and Raymond Smith beat Ron Lally to death. That Smith participated and shot Lally does not mitigate the appropriate punishment.

{¶ 105} Jalowiec's history, character, and background provide some mitigating features. Several witnesses testified on Jalowiec's behalf, including his parents, sister, and grandfather, and a former girlfriend. Ray Pasterczyk told how Jalowiec helped him do odd jobs around his house while he recuperated from knee-

replacement surgery. Jackie Chaffin, Jalowiec's former live-in girlfriend, stated that Jalowiec was her oldest son Derrick's "best friend" and that Jalowiec continued to give him presents and cards, even when she and Jalowiec were not living together. Chaffin recounted how Jalowiec regularly took Chaffin's youngest son, Cody, who had numerous medical problems, to therapy, and that he would baby-sit Derrick too. Chaffin described Jalowiec as "great with my children" and stated that he "never caused trouble for me."

{¶ 106} Nancy Morrison, a friend of Jalowiec and his family, testified that Jalowiec "loved kids" and was always courteous and nice to her. Jalowiec's grandfather, Edward Jalowiec, recounted how Jalowiec worked at his golf course and would help him do other chores. He stated that Jalowiec "wouldn't go hunting with us. He wouldn't kill a thing * * *." He further noted Jalowiec's problems with arthritis and hoped that the jury would spare his life.

{¶ 107} Jalowiec's younger sister, Tammy Jalowiec, stated that she had a good relationship with her brother and never had any problems with him. She also spoke of Jalowiec's problems with arthritis and claimed that Jalowiec was the victim in the bar fight that resulted in criminal charges brought against him. She pleaded with the jury not to sentence Jalowiec to death.

{¶ 108} Jalowiec's father, Edward Jalowiec, testified that he got along "real good" with his son. He denied his son's guilt in the arson charge that followed a bar fight. Jalowiec's father also expressed disbelief that his son could have killed anyone, since "he wouldn't even shoot a rabbit."

{¶ 109} Jalowiec's mother, Sarah Jalowiec, described her son as someone who always had been "a fun loving kid" and stated that he "loved animals." She confirmed that Jalowiec's rheumatoid arthritis prevented him from holding down a job. Mrs. Jalowiec stated that he "loves people" and asked the jury to spare her son's life.

{¶ 110} Jalowiec gave an unsworn statement in which he denied killing Lally and claimed that he and Lally had been friends. He gave a brief life story that included the chronology of his arthritis. He claimed that it prevented him from writing continuously, and that, as a result, he had had to quit high school. He admitted that other criminal charges had been brought against him, which were still pending. In general, Jalowiec denied that he had committed the various crimes alleged in the pending charges and cast himself as a victim who had acted in self-defense.

{¶ 111} With regard to the statutory mitigating factors of R.C. 2929.04(B), the fact that the killers and victim were smoking crack cocaine prior to the murder did not place Jalowiec under duress, coercion, or strong provocation under factor two. Factor four, the youth of the offender, has little weight, since Jalowiec was twenty-three years old at the time of the offense. Factor five is relevant, since Jalowiec lacked a significant history of prior criminal convictions or delinquency adjudications. Factor six is not implicated, since Jalowiec participated directly in the killing when he and Raymond Smith beat Lally and when he attempted to drive over Lally's body several times before fleeing the cemetery.

{¶ 112} Under factor seven, the catchall factor, several aspects are worthy of weight in mitigation. The love and support that Jalowiec enjoys from his family is entitled to some weight. See, *e.g., Mason,* 82 Ohio St.3d at 170, 694 N.E.2d at 957. Jalowiec's chronic rheumatoid arthritis is worthy of slight weight in mitigation. The fact that Jalowiec was under the influence of crack cocaine at the time of the offense could also be considered mitigating under this factor. See *Sowell,* 39 Ohio St.3d at 324-326, 530 N.E.2d at 1299-1300.

{¶ 113} Upon independent weighing, we conclude that the aggravating circumstance outweighs the mitigating factors beyond a reasonable doubt. The killing of a witness to prevent his testimony in another criminal proceeding strikes

at the heart of the criminal justice system. See *State v. Keene* (1998), 81 Ohio St.3d 646, 671, 693 N.E.2d 246, 266-267.

{¶ 114} The death penalty imposed in this case is both appropriate and proportionate with the death sentence imposed on Jalowiec's fellow murderer, Raymond Smith, in *Smith,* 87 Ohio St.3d 424, 721 N.E.2d 93, and the sentence given in *Coleman,* 85 Ohio St.3d 129, 707 N.E.2d 476. Both cases involved the single specification of murdering a witness to prevent his testimony in a criminal proceeding. The sentence is also appropriate and proportionate to the sentence imposed in cases with capital specifications in addition to the (A)(8) specification. See *State v. Lawson* (1992), 64 Ohio St.3d 336, 595 N.E.2d 902; *State v. Hooks* (1988), 39 Ohio St.3d 67, 529 N.E.2d 429. For these reasons, the judgment of the court of appeals is hereby affirmed.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, RESNICK and F.E. SWEENEY, JJ., concur.

COOK, J., concurs in judgment.

LUNDBERG STRATTON, J., concurs in part and dissents in part.

————————————

**Lundberg Stratton, J., concurring in part and dissenting in part.**

{¶ 115} While I concur in the portion of the majority's opinion affirming defendant's convictions, I dissent from the decision to uphold the sentence of death because I do not believe that defendant's unsworn statement opened the door to all of the prejudicial information presented by the prosecution in rebuttal.

{¶ 116} At the mitigation hearing, defendant made an unsworn statement. Defendant stated that he had a good grade school record and had perfect attendance until he was diagnosed with rheumatoid arthritis when he was twelve or thirteen years old. He told of several odd jobs that he held intermittently when he was able to work.

{¶ 117} Defendant told the jury that eventually he met a single mother with one son, and the three moved in together. When defendant's arthritis became so severe that he could no longer work, he stated, he stayed home and took care of his girlfriend's son while she worked. He told the jury that he would clean the house, go for walks with her son and the dog, and spend time with the child, flying kites and doing other activities. Defendant and his girlfriend broke up for a period of time, and she became pregnant while they were apart. Ultimately, defendant and his girlfriend got back together, and he accepted her new baby and helped raise the baby as well. For a short time, defendant went back to work in order to help support both children. However, when it was discovered that the baby was deaf, defendant stated, he quit his job in order to take the baby to various therapy appointments. In general, defendant maintained his innocence of the murder. Defendant stated that although Danny Smith "caught some drug cases, you know, I didn't catch no drug cases."

{¶ 118} Following defendant's unsworn statement, his attorney approached the bench and stated that he was unsure how the court intended to proceed. Counsel stated that if the court felt that he had not opened the door for rebuttal by the prosecution, then that was all that counsel would present in mitigation. When the trial court stated that the prosecutor was entitled to some rebuttal, the prosecuting attorney said that he would rebut defendant's portrayal of himself as a "caring individual who wanted to work, but could not, and cares for these kids." He explained, "I think since he has chosen to put that trait into evidence, it is not a 404(B) or 404(A) problem as much as it is straight out rebuttal of an issue that he chose to put in effect and not in the case in chief."

{¶ 119} After the trial court ruled that defendant's unsworn statement could be rebutted under Evid.R. 404(A)(1) and defense counsel knew that the prosecutor would be allowed to bring in evidence of other crimes, counsel decided to put the

defendant back on the stand in an attempt to minimize the impact of the evidence by allowing defendant to deliver some of the information himself.

{¶ 120} Defendant took the stand for a second time and revealed that although he had no prior criminal felony convictions as an adult, he had been charged with other felonies. Defendant then described that he had been charged with felonious assault in conjunction with a bar fight in 1994. Defendant explained the circumstances of the bar fight and his involvement. He maintained his innocence, stating that he was at a bar in Elyria with a group of people celebrating his sister's friend's birthday when five men in the bar attempted to pick a fight. He claimed that when the bar closed, he and his group left and were outside when he was jumped and assaulted by the men who had bothered him earlier inside the bar. He further opined that the only reason he had been charged was because of the current homicide case.

{¶ 121} Defendant further revealed that he had been charged with drug abuse, possession of drug paraphernalia, and aggravated drug trafficking, and he explained the nature of his involvement. Further, defendant stated that he had been charged with menacing and arson. The menacing and arson charges resulted from an incident in which defendant was shooting pool at a bar in Cleveland with some friends. Defendant stated that he approached a young lady and offered to buy her a drink when her boyfriend grabbed him by the throat and choked him until he passed out. Defendant's party was asked to leave, and defendant claims that they went to another bar, where he was again assaulted on the street. A police car pulled up, and the officers ran defendant's name through the computer. They told defendant that someone had pressed charges against him that night for menacing and arson. Defendant explained that the man who had choked him earlier alleged that when he left the bar, he found his car on fire and accused defendant of setting the fire. Defendant maintained his innocence relating to both the menacing and the arson.

{¶ 122} Before defendant left the stand, he asked the jurors not to consider these alleged crimes in their deliberations. He pleaded with them that these were only charged crimes and that the state had not proven that he had committed them. He further reiterated his belief that the reason none of these charged crimes had been brought to trial was that the state had been using the charges as leverage, waiting to see if he would be convicted of the aggravated murder charges. At the conclusion of his remarks, defendant asked the jury to spare his life.

{¶ 123} Following defendant's statement, the defense called seven witnesses to testify about defendant's childhood, medical problems, and relationships with the witnesses. Several of the defense witnesses also asked the jury to spare defendant's life. In particular, defendant's mother, father, sister, grandfather, former girlfriend, friend, and former employer testified. Throughout the testimony, the state was permitted to cross-examine the witnesses relentlessly regarding their knowledge or lack thereof regarding the felonious assault, arson, drug, and other charges.

{¶ 124} After the extensive cross-examination, the state called seven witnesses in rebuttal. Dennis Cavanaugh, the head of the Lorain County Drug Task Force, testified at length regarding two alleged undercover sales of controlled drugs to the defendant in 1994. Charges related to these sales had been filed against the defendant but had not been brought to trial. Further, Scott Bohac, an informant, testified that he had purchased crack cocaine from defendant in 1994. Detective Scott Sargent testified that in 1994, he observed a crack pipe fall out of defendant's pant leg when he was pulled over for a traffic stop.

{¶ 125} Jeff Hicks testified at length about the bar incident that led to the felonious assault charges against defendant. When asked how he knew defendant, Hicks stated that defendant "is the one that took a baseball bat to my face." Hicks testified that he had been hospitalized for three months with an infected jaw as a result of injuries sustained during the bar fight and that his medical bills totaled

$20,000. Deanna Butler testified that she heard about the details of the alleged bar fight from a cousin of Jeff Hicks (which was pure hearsay that should not have been admitted), and that later that day she heard defendant bragging about kicking Hicks. Kenneth Roland testified that he was also injured in the 1994 incident in which defendant was alleged to have picked a fight at an Elyria bar. Roland testified that he was in the hospital for three days and sustained medical bills of $10,000. Amazingly, Roland was permitted to testify regarding this alleged incident even though he was unable to positively identify defendant as the man who struck him.

{¶ 126} Finally, Detective Alan Leiby testified about investigating the murder. In particular, he testified about plea offers and witnesses. After defense counsel suggested in cross-examination that these charges without convictions were not relevant to the penalty phase and were highly prejudicial, the state on redirect asked Detective Leiby, "Were what he calls the other acts or the mere allegations even relevant until the Defendant took the stand and stated that he loves animals and he hates blood, he is a great guy and he likes kids?" The detective answered, "No." But he admitted on cross-examination that the felonious assault, the drug possession, and the arson charges had nothing to do with the way defendant was alleged to have dealt with children and animals, since those charged crimes all involved adults.

{¶ 127} Further, defendant himself did not state that he was a good guy, could not stand the sight of blood, or loved animals, the statements supposedly rebutted with evidence of other charges. These statements came from mitigation witnesses that the defense put on the stand only after the judge ruled that defendant had opened the door to evidence of other crimes and the defense was forced to present testimony regarding those pending charges.

{¶ 128} The majority concludes that defendant opened the door to this rebuttal testimony and that the rebuttal testimony did not amount to the introduction of nonstatutory aggravating circumstances as proscribed in *State v. Gumm* (1995),

73 Ohio St.3d 413, 422, 653 N.E.2d 253, 263. Specifically, the majority agrees with the trial court's assessment that this other-acts evidence regarding prior crimes of violence was admissible under Evid.R. 404(A)(1) because defendant brought out a character trait and, in the trial court's opinion, the defendant had portrayed himself as a "great guy" even though defendant never used those words. I strongly disagree.

{¶ 129} Evid.R. 404(A)(1) provides:

"(A) Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, subject to the following exceptions:

"(1) Character of accused. Evidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same is admissible     *  * *."

{¶ 130} Because defendant initially stated that he had never had any drug charges, I agree that the defense opened the door to evidence relating to the drug charges. Further, the rebuttal testimony of Detective Leiby was admissible because it primarily covered the murder investigation itself. But I fail to see how the trial court could conclude that defendant had opened the door to the blatantly prejudicial evidence of the felonious assault and arson charges simply by portraying himself, in the court's words, as "a great guy."

{¶ 131} I would find that the content of defendant's unsworn statement did not warrant seven rebuttal witnesses testifying with virtually no limitation about crimes of which defendant has never been convicted and which defendant hotly contested. If portraying oneself as a good person can open the door to witness after witness and page after page of such speculative and damaging testimony, then I cannot imagine any case that would not open the door to such evidence. Under the standard used in this case, almost any positive comment a defendant could make about himself or herself would open the door to every possible or even speculative misdeed he or she ever committed or was even alleged to have committed.

{¶ 132} The other-acts evidence relating to the felonious assault and arson charges amounted to nothing more than a blatant attempt to discredit a person who up until this point in his life was without a criminal record. In mitigation, defendant's mother, father, grandfather, and sister all testified that they had good relationships with the defendant. Defendant worked until his arthritis prohibited him from doing so. Defendant had a relatively clean background before he was charged with aggravated murder. Moreover, the family vendetta involved the Smiths, not the defendant, and there was no evidence that the victim had ever snitched on defendant. Rather than being an instigator, defendant appeared to have been recruited for the crime. These are all mitigating factors.

{¶ 133} Certainly I do not condone defendant's actions in the underlying case. Obviously, he is still just as guilty of murder as Raymond Smith. Thus, he was properly convicted of aggravated murder in the guilt phase of the trial. However, in the mitigation phase of the trial, the jury weighs evidence relating to whether the defendant's life is worth sparing or whether he deserves the death penalty. Therefore, every piece of evidence or testimony, either sympathetic or prejudicial, affects the jury.

{¶ 134} Again, while not excusing the murder itself, the fact that defendant was not the leader in the murder could have an impact on the jury. In addition, defendant had a relatively uneventful history prior to the murder. These factors make the evidence of other criminal charges so prejudicial to this defendant. If defendant's background prior to the murder had already seemed to mirror the challenged testimony, the effect would not have been as great. But, in this case, the prejudicial other-acts evidence may have influenced the jury to vote for the death penalty. I would find that these trials within the trial were so prejudicial that they probably affected the jury's decision regarding the sentence and tipped the scale toward death.

{¶ 135} None of the testimony rebutted defendant's work history or his claim of inability to hold a job. The prosecution presented no evidence of a false workers' compensation claim. No rebuttal witness testified that he was abusive to his girlfriend or her children or otherwise disputed his caring nature toward his girlfriend's children or his assistance to her deaf child. Other than testimony relating to defendant's drug charges, none of the testimony was rebuttal at all—it was all new "other acts" which were all only at a "charge" stage—none even reduced to a conviction so as to lend them reliability.

{¶ 136} If this type of testimony is allowed, I fear the protections of the Constitution will be irreparably eroded. I respectfully dissent and would vacate the sentence of death and remand to the trial court for a new mitigation hearing that would exclude the testimony relating to the felonious assault and arson charges.

_____

APPENDIX

{¶ 137} Proposition of Law I: Appellant Jalowiec's sixth, eight and fourteenth amendment rights as guaranteed by U.S. CONST. were violated by the admission at trial of a co-defendant's confession inculpating the defendant.

{¶ 138} Proposition of Law II: Appellant Jalowiec was denied his fifth, sixth, eighth and fourteenth amendment rights as guaranteed by the U.S. Constitution by the admission of statements of a co-conspirator which did not meet the requirements of 801(D)(2)(e) of the Ohio Rules of Evidence.

{¶ 139} Proposition of Law III: U.S. CONST., amendments five, six, eight, and fourteen and Article I, Sections 10 and 16 of the OHIO CONST. require that a court grant a motion for judgment of acquittal when the evidence is insufficient to sustain a conviction.

{¶ 140} Proposition of Law IV: Jurors viewing a defendant in shackles is a violation of the U.S. CONST., 14th amendments [*sic*] and Article I, Section 10 of the OHIO CONST.

{¶ 141} Proposition of Law V: The ineffective assistance of counsel provided to Appellant violated his rights to a fair and impartial jury trial and sentence, as guaranteed by the fifth, sixth, eighth and fourteenth amendments to the U.S. CONST. and the OHIO CONST.

{¶ 142} Proposition of Law VI: The 6th and 14th amend. to the U.S. CONST. and Sections 10 and 16 of the OHIO CONST. guarantee an accused a fair trial and an impartial jury. The improper exclusion for cause of potential jurors because of their views on the death penalty denied appellant Jalowiec these constitutional guarantees.

{¶ 143} Proposition of Law VII: The death sentence in appellant Jalowiec's case is unreliable and inappropriate under the 8th and 14th amend. to the U.S. CONST. and Sections 9, 10, and 16, Article I of the OHIO CONST. and R.C. 2929.05.

{¶ 144} Proposition of Law VIII: The proportionality review that this court must conduct in the present capital case pursuant R.C. 2929.05 is fatally flawed and, therefore, the present death sentence must be vacated pursuant to the 5th, 8th, and 14th amend. to the U.S. CONST. and Sections 5 and 10, Article I of the OHIO CONST. and R.C. 2929.05.

{¶ 145} Proposition of Law IX: Improper penalty phase jury instructions violate an individuals [*sic*] rights as guaranteed by the U.S. CONST., amend. 5, 6, 8, and 14 and Ohio Const. Article I Section 10.

{¶ 146} Proposition of Law X: Ohio's death penalty law, OHIO REV. CODE 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.04 and 2929.05 violate U.S. CONST. amend.V, VI, VIII, and XIV and Article I, Sections 1, 2, 5, 9, 10 and 16.

{¶ 147} Proposition of Law XI: Appellant Jalowiec was denied his 6th, 8th, and 14th amendment rights as guaranteed by the U.S. CONST. and Sections 8 and 10, Article I of the OHIO CONST. to a fair trial, due process and a reliable

determination of his guilt and sentence when gruesome, prejudicial and cumulative photographs were admitted into evidence even though their prejudicial effect outweighed their probative value.

{¶ 148} Proposition of Law XII:   To allow evidence of nonstatutory aggravating factors during the sentencing phase of appellant's trial violated his rights guaranteed by the U.S. CONST. amend. 6, 8, and 14 and OHIO CONST. Article I, Section 10.

{¶ 149} Proposition of Law XIII:   The trial court's jury instruction in the fact-finding phase denied petitioner his rights to be free from cruel and unusual punishment, to a fair trial, to the effective assistance of counsel, to a fair and impartial jury and the due process of law under the Fifth, Sixth, Eighth and Fourteenth Amend. to the U.S. CONST. and Article I, Section 10 of the OHIO CONST.

_____

*Gregory White*, Lorain County Prosecuting Attorney, and *Jonathan E. Rosenbaum*, Chief Counsel, Criminal Division, for appellee.

*Patricia A. Millhoff* and *Nathan Ray,* for appellant.

_____