THE STATE OF OHIO, APPELLEE, *v.* TURNER, APPELLANT.

[Cite as *State v. Turner,* 105 Ohio St.3d 331, 2005-Ohio-1938.]

(No. 2003–0346—Submitted January 18, 2005—Decided May 11, 2005.)

O'DONNELL, J.

{¶ 1} On June 12, 2001, appellant, Michael R. Turner, murdered his estranged wife, Jennifer Lyles Turner, and Ronald Seggerman in Reynoldsburg, Ohio. Turner later pleaded guilty to two counts of aggravated murder with death-penalty specifications, and the court sentenced him to death. He appeals from his convictions and sentence. For the following reasons, we affirm.

{¶ 2} Turner's criminal history dates from 1980; while a felony suspect being transported by a deputy sheriff for a polygraph in Virginia, Turner attempted to kill the deputy sheriff with a letter opener. During the struggle, Turner jabbed at the deputy and also tried to grab the deputy's pistol. Turner pleaded guilty to attempted murder and received a 15–year prison term but served only five years before being paroled.

{¶ 3} Upon his release from prison, he managed to earn a living, but he violated parole and became incarcerated. After a second release from prison, he divorced his first wife, Paula, and married Jennifer Lyles in January 2000 in Bassett, Virginia. Within months of their marriage, Turner began abusing his wife to the point that she fled to the homes of friends and neighbors. In September 2000, Jennifer left Virginia and moved to the Columbus area at her mother's insistence to escape Turner's abuse. In December, she moved to her own apartment in Reynoldsburg. Later that month, Turner asked Jennifer for "another chance," and she allowed him to move in with her.

{¶ 4} On March 14, 2001, however, she filed a domestic-violence complaint against Turner after he hit her in the head during an argument. On April 5, 2001, she filed another complaint after he choked her to near unconsciousness. The next day, the court granted a temporary protection order ("TPO"), compelling Turner to move out of his wife's apartment.

{¶ 5} On May 5, 2001, police arrested Turner for violating the TPO. Angry with Jennifer because she had called police, Turner told the arresting officers that

"the war is on." On May 18, 2001, Turner pleaded guilty to misdemeanor domestic violence, and the court placed him on probation.

{¶ 6} After the imposition of his probationary term, Turner began stalking Jennifer. She filed a complaint against Turner for telephone harassment on May 25, 2001—charges that were still pending on the day of the murders. The next day, Turner told a co-worker at a Tim Hortons Restaurant that Jennifer had angered him by having him arrested and by filing the telephone-harassment complaint against him. Turner announced that he was going to "suit up and kill the bitch." Boasting that he was a "cop killer" by reenacting the 1980 attempted murder of the deputy in Virginia, he showed his co-worker a list of items that he called "No Prisoners," which included duct tape, a knife, rope, fuel, and matches, all necessary for his plan to, in Turner's words, "off the bitch."

{¶ 7} Two days before the murder, Turner told a bartender: "I'm going to kill my wife. She took me to court for harassment. I'm going to off her. You watch me."

{¶ 8} On the day of the murders, Turner gathered the necessary items for his plan. He bought two knives, and two hours later, he bought two gallons of gasoline.

{¶ 9} On June 12, shortly after 10:00 p.m., Turner located Jennifer and her friend, Ronald Seggerman, at her apartment. Jennifer stayed inside while Seggerman grilled food outside. John Myers, Jennifer's neighbor, had been in his front yard and saw Seggerman pointing toward a parking lot located about 100 yards north of the apartment. Seggerman shouted, "[T]here he is," and went inside.

{¶ 10} Seggerman came back outside armed with nunchakus and walked toward the parking lot, where Myers lost sight of him.

{¶ 11} Myers then observed Turner forcing Seggerman to back up toward Jennifer's apartment. When they got to Myers's front yard, Myers saw Turner make several downward thrusts with a knife. At 10:28 p.m., Myers called 911, stating, "[T]he guy is being stabbed to death. I saw the knife and I saw him going down. Get a cop here."

{¶ 12} At 10:32 p.m., Jennifer Turner also made a 911 call. The recording of this call reveals Jennifer's screams for help begging Turner to stop and Seggerman's plea with Turner, "Mike, you gotta stop."

{¶ 13} Reynoldsburg police arrived at 10:34 p.m. The first officer on the scene found Jennifer bleeding profusely from the neck with Seggerman lying next to her, face down in a pool of blood. Medics were unable to find Seggerman's pulse rate or respiration. Jennifer had "shallow respiration and a weak pulse." Both underwent emergency surgery.

{¶ 14} Jennifer Turner and Ronald Seggerman both died later that night of multiple stab wounds. Autopsies showed that Jennifer had sustained 11 stab wounds and Seggerman at least four, including one that punctured his lung.

{¶ 15} Meanwhile, following the ambulance transport, police located Turner hiding in some trees near the parking lot at Jennifer's apartment. He had blood on his face, arms, shirt, and shoes. Near Turner's hiding place, police found a hunting knife, rope, chains, two locks, a hammer, and two one-gallon plastic jugs containing gasoline. On June 13, police returned and found bloodstained gloves, a bloodstained fillet knife, and a sheath for a knife.

{¶ 16} Also on June 13, detectives searched Michael Turner's apartment. There they found a copy of Jennifer's May 5 complaint against Turner and a handwritten list in Turner's writing that included "knives, rope, gloves, gas, lock and hammer."

{¶ 17} Detectives interrogated Turner on the morning of June 13. Turner told them that he had been "standing there in the parking lot" when Seggerman "came across there with [he doesn't] know if it was a baseball bat or what it was." According to Turner, a jug of gasoline happened to be "sitting there," so he "ran towards [Seggerman] and threw it in his face." Turner then began to beat Seggerman, who dropped his "stick" in the parking lot. Turner admitted that he "probably" had a knife. He stated that Jennifer came outside and "jumped in the middle trying to break [them] up." Turner said, "I'm trying to push her away and she was … and I went, oh, fuck what did I do?" (Ellipsis sic.) He stated, "[I]t happened so quick I really had no control over it."

{¶ 18} While in custody in the Franklin County Jail, Turner told a fellow inmate that "he murdered his wife and her boyfriend; that he went over to talk to his wife and never expected her boyfriend to be there." He also told his cellmate that he had planned to kill Jennifer and commit suicide, but Seggerman "got in the way." Turner claimed that "he didn't mean to kill [Seggerman]" but admitted that "he did mean to kill Jennifer."

{¶ 19} A grand jury indicted Turner for the aggravated murders of Jennifer Turner and Ronald Seggerman with prior calculation and design. R.C. 2903.01(A). Count 1, charging Jennifer's murder, contained three death-penalty specifications: R.C. 2929.04(A)(5) (prior conviction), R.C. 2929.04(A)(5) (course of conduct), and R.C. 2929.04(A)(8) (witness murder). Count 2, charging Seggerman's murder, contained two death-penalty specifications: prior conviction and course of conduct.

{¶ 20} On October 25, 2002, Turner filed a written waiver of his right to a jury trial. On December 16, 2002, Turner entered a plea of guilty to both counts and all specifications of the indictment. The three-judge panel conducted a hearing at which the state introduced exhibits and read a statement of supporting facts.

With a few exceptions not relevant here, the defense stipulated to the facts contained in the statement.

{¶ 21} The three-judge panel then accepted Turner's plea, found him guilty on all counts and all specifications, and, after a mitigation hearing, sentenced Turner to death.

## I. Validity of Jury Waiver and Guilty Plea

{¶ 22} In his first proposition of law, Turner contends that both his jury waiver and his guilty plea were invalid.

{¶ 23} At a hearing on October 24, 2002, Turner submitted to the court a written, signed jury waiver. The waiver stated: "I fully understand that under the laws of this State, I have a constitutional right to a trial by jury." The trial court asked Turner, "And you understand * * * you're waiving your right to have a jury of 12 persons hear and decide the case * * * and render a unanimous verdict * * *?" Turner replied, "Yes, sir." Turner then affirmed that, after consulting counsel, he wanted a three-judge panel to hear his case. Turner filed the waiver on October 25.

{¶ 24} Turner claims that his jury waiver was invalid because the trial court did not inform him that a single juror could block imposition of a death sentence. We rejected such a claim in *State v. Bays* (1999), 87 Ohio St.3d 15, 20, 716 N.E.2d 1126, as did the Court of Appeals for the Sixth Circuit in *Sowell v. Bradshaw* (C.A.6, 2004), 372 F.3d 821, 834.

{¶ 25} A defendant "need not have a complete or technical understanding of the jury trial right in order to knowingly and intelligently waive it." *Bays,* 87 Ohio St.3d at 20, 716 N.E.2d 1126, citing *United States v. Martin* (C.A.6, 1983), 704 F.2d 267, 273. Nor is a trial court required "to interrogate a defendant in order to determine whether he or she is fully apprised of the right to a jury trial." *State v. Jells* (1990), 53 Ohio St.3d 22, 559 N.E.2d 464, paragraph one of the syllabus. Accord *Spytma v. Howes* (C.A.6, 2002), 313 F.3d 363, 370. Instead, "a written waiver, signed by the defendant, filed with the court, and made in open court, after arraignment and opportunity to consult with counsel" suffices. *Jells,* 53 Ohio St.3d at 26, 559 N.E.2d 464. See, generally, *State v. Fitzpatrick,* 102 Ohio St.3d 321, 2004-Ohio-3167, 810 N.E.2d 927, ¶ 43–44. Furthermore, a written jury waiver is presumed to have been voluntary, knowing, and intelligent. *United States v. Sammons* (C.A.6, 1990), 918 F.2d 592, 597.

{¶ 26} A defendant can knowingly and intelligently waive his right to a jury trial if he understands "that the choice confronting him [is], on the one hand, to be judged by a group of people from the community, and on the other hand, to have his guilt or innocence determined by a judge." *United States ex rel. Williams v. DeRobertis* (C.A.7, 1983), 715 F.2d 1174, 1180. Accord *Fitzpatrick,*

102 Ohio St.3d 321, 2004-Ohio-3167, 810 N.E.2d 927, ¶ 47; *Sammons,* 918 F.2d at 597; *Sowell v. Bradshaw,* 372 F.3d at 832.

{¶ 27} Nothing in the record overcomes the presumption that Turner's written waiver was voluntary, knowing, and intelligent. The record shows that Turner understood that he had a choice between a jury of 12 and a three-judge panel. He was expressly told on October 24 that he had a "right to have a jury of 12 persons hear and decide the case * * * and render a unanimous verdict." His written waiver states: "I[,] Michael R. Turner, * * * hereby voluntarily waive and relinquish my right to a trial by jury *and elect to be tried by 3 judges* of the court in which said cause may be pending." (Emphasis added.)

{¶ 28} Turner failed to make "a plain showing that [his] waiver was not freely and intelligently made." *Adams v. United States ex rel. McCann* (1942), 317 U.S. 269, 281, 63 S.Ct. 236, 87 L.Ed. 268. See, also, *Bays,* 87 Ohio St.3d at 19, 716 N.E.2d 1126; *Sowell,* 372 F.3d at 832. We therefore reject his challenge to the jury waiver and turn to the guilty plea.

{¶ 29} On December 16, 2002, Turner entered a plea of guilty to all counts and specifications in the indictment. He submitted a written plea that included the following acknowledgements:

{¶ 30} "I understand that my guilty plea to the crimes specified constitutes both an admission of guilt and a waiver of any and all constitutional, statutory, or factual defense[s] with respect to such crimes and this case. I further understand that by pleading 'Guilty', I waive a number of important and substantial constitutional, statutory and procedural rights, which include, but are not limited to, the right to have a trial by jury, the right to confront witnesses against me, to have compulsory subpoena process for obtaining witnesses in my favor, to require the State to prove my guilt beyond a reasonable doubt * * * at a trial at which I cannot be compelled to testify against myself, and to appeal the verdict and rulings of the trial Court * * *."

{¶ 31} The written plea included a statement by Turner's trial attorneys certifying that they had "counseled [him] * * * with respect to the facts and law of this case" and that, in their opinion, he was acting knowingly, voluntarily, and intelligently. During the plea colloquy, Turner reaffirmed that he had consulted counsel.

{¶ 32} In open court, the trial judge explained to Turner the charges against him, his rights, and the potential penalties he faced, including the death penalty. Turner said he understood the court's explanations. He affirmed that his plea was voluntary and that no one had threatened him, coerced him, or promised him leniency to induce the plea. Although Turner was taking a mood-stabilizing drug, both he and his counsel stated that the drug did not affect his understanding of

the proceedings or his judgment. See, generally, *State v. Mink*, 101 Ohio St.3d 350, 2004-Ohio-1580, 805 N.E.2d 1064, ¶ 64–68.

{¶ 33} Before accepting a guilty plea, a "trial court must inform the defendant that he is waiving his privilege against compulsory self-incrimination, his right to jury trial, his right to confront his accusers, and his right of compulsory process of witnesses." *State v. Ballard* (1981), 66 Ohio St.2d 473, 20 O.O.3d 397, 423 N.E.2d 115, paragraph one of the syllabus, following *Boykin v. Alabama* (1969), 395 U.S. 238, 242, 89 S.Ct. 1709, 23 L.Ed.2d 274. See, also, Crim.R. 11(C)(2)(c); *Fitzpatrick*, 102 Ohio St.3d 321, 2004-Ohio-3167, 810 N.E.2d 927, ¶ 52.

{¶ 34} Here, the three-judge panel fully complied with *Ballard* and Crim.R. 11(C)(2)(c). The court informed Turner that his guilty plea would waive his privilege against self-incrimination: "[Y]ou would also have * * * the right to remain silent, and no one may comment on the fact that you sit in silence throughout the trial." The court explained that, by pleading guilty, Turner was waiving his right to be tried by "a jury of 12 persons," his right to "require the State of Ohio to prove [him] guilty of all the elements of the offenses and the specifications to those offenses to a standard of beyond a reasonable doubt," his right to "cross-examine the witnesses of the State" and "to confront those witnesses face to face," and his right to subpoena "any witnesses that [he] may have that would testify in [his] favor."

{¶ 35} Turner does not question the trial court's compliance with *Ballard*. He argues only that his guilty plea was invalid because the trial court did not specifically tell him that a single juror could prevent imposition of a death sentence. Such an omission does not invalidate a jury waiver, *Bays*, 87 Ohio St.3d at 20, 716 N.E.2d 1126, and no reason exists why it should invalidate a guilty plea. Turner's first proposition of law is overruled.

## II. Conviction on Stipulated Facts

{¶ 36} At Turner's December 12, 2002 plea hearing, the prosecutor read into the record a statement of facts pertaining to the charged offenses entitled "Guilty Plea Supporting Facts," which became State's Exhibit 8. With a few exceptions, the defense stipulated to the facts set forth in State's Exhibit 8.[1] The prosecution "submitted [State's Exhibit 8] to the Court in lieu of calling witnesses for examination." The state also introduced several other exhibits into evidence, but no witnesses testified. On that state of the record, the panel accepted Turner's guilty plea and found him guilty of all counts and specifications in the indictment.

---

1. The defense declined to stipulate to assertions that Turner had psychologically abused Jennifer, that she had "sought refuge at the homes of friends and neighbors" when abused, and that her move to Ohio had been motivated by her desire to escape Turner's abuse.

{¶ 37} In his second proposition of law, Turner contends that the panel could not properly find him guilty based on State's Exhibit 8 but rather should have required live testimony pursuant to R.C. 2945.06 and Crim.R. 11, as construed in *State v. Green* (1998), 81 Ohio St.3d 100, 689 N.E.2d 556.

{¶ 38} In *Green*, the defendant pleaded guilty to aggravated murder and two capital specifications. The prosecutor recited a statement of facts to provide a factual basis for the guilty plea. However, "[n]o witnesses were called and no testimony was taken," and exhibits proffered by the state were not admitted. Id., 81 Ohio St.3d at 100–101, 689 N.E.2d 556. The trial court accepted Green's guilty plea and, after a mitigation hearing, sentenced him to death. Id. at 101–102, 689 N.E.2d 556.

{¶ 39} We reversed, holding that "[w]hen a defendant pleads guilty to aggravated murder in a capital case, a three-judge panel is required to examine witnesses and to hear any other evidence properly presented by the prosecution in order to make a Crim.R. 11 determination as to the guilt of the defendant." Id. at syllabus. Furthermore, "a statement of facts by a prosecutor does not constitute evidence" and hence "does not satisfy the evidentiary requirements under Crim.R. 11 and R.C. 2945.06." Id., 81 Ohio St.3d at 104, 689 N.E.2d 556.

{¶ 40} According to Turner, *Green* controls this case. However, *Green* is distinguishable on a significant legal point. There, we held that a statement of facts *by the prosecutor* is not evidence. See id., 81 Ohio St.3d at 104, 689 N.E.2d 556. Here, however, unlike the statement in *Green*, State's Exhibit 8 is not merely a unilateral statement of facts by the prosecutor; rather, Turner stipulated to the relevant facts in State's Exhibit 8, and a stipulation, which is agreed to by *both* parties, *is* evidence. See *People v. Griggs* (2003), 110 Cal.App.4th 1137, 1140, 2 Cal.Rptr.3d 380; *Gulley v. Natl. Life & Acc. Ins. Co.* (La.App.1954), 73 So.2d 341, 343–344; *Southdale Ctr., Inc. v. Lewis* (1961), 260 Minn. 430, 434, 110 N.W.2d 857 (stipulation "has the same force and effect * * * as testimony"). "It is, in truth, a substitute for evidence, in that it does away with the need for evidence." 9 Wigmore, Evidence (Chadbourn Rev.1981) 821, Section 2588.

{¶ 41} As we said in *State v. Post* (1987), 32 Ohio St.3d 380, 393, 513 N.E.2d 754: "Agreements, waivers and stipulations made by the accused, or by the accused's counsel in his presence, during the course of a criminal trial are binding and enforceable. * * * Although R.C. 2945.06 requires the court to 'examine the witnesses' in determining whether the accused is guilty of aggravated murder, we find that appellant was bound by the agreed-upon procedure wherein the state would proffer a statement of facts in lieu of witnesses or other evidence."

{¶ 42} In *Green*, we expressly declined to reconsider *Post*. Instead, we distinguished *Post* "[b]ecause Green's counsel made no such agreement," as Post's counsel had. *Green*, 81 Ohio St.3d at 104, 689 N.E.2d 556. The same distinction

applies here. Unlike Green, Turner stipulated to the operative facts in this case, and pursuant to *Post*, he is bound by his stipulation. Accordingly, Turner's second proposition of law is not well taken, and it is overruled.

### III. Ineffective Assistance

### A. Prior–Conviction Specification

{¶ 43} Under R.C. 2929.04(A)(5), an aggravating circumstance exists if, "[p]rior to the offense at bar, the offender was convicted of an offense an essential element of which was the *purposeful* killing of or attempt to kill another." (Emphasis added.) Turner pleaded guilty to this specification, together with the other charges in the indictment. However, in his fourth proposition of law, Turner contends that he did not receive effective assistance of counsel, and, as a result, he should not have been convicted of the prior-conviction specification under R.C. 2929.04(A)(5).

{¶ 44} It is undisputed that the state of Virginia convicted Turner of attempted murder in 1980. In Virginia, attempted murders are prosecuted under Va.Code Ann. 18.2–25, which provides: "If any person attempts to commit an offense which is punishable with death, he shall be guilty of a Class 2 felony." However, Turner contends that "purpose to kill" is not an essential element of attempted murder under Va.Code Ann. 18.2–25. Therefore, he argues, his Virginia attempted-murder conviction cannot be the basis for a prior-conviction specification under R.C. 2929.04(A)(5). He contends that his counsel ineffectively represented him because they "fail[ed] to adequately investigate the circumstances of [his] attempted murder conviction in Virginia," failed "to properly advise [him] as to the applicable law," and thereby "allow[ed him] to plead guilty to a capital specification that the State could not prove."

{¶ 45} To prevail on an ineffective-assistance claim, a defendant must demonstrate that his counsel performed deficiently and that he suffered prejudice from the deficiency. Deficient performance consists of falling below an objective standard of reasonable representation; to prove prejudice, a defendant must demonstrate that, but for counsel's errors, the result of the proceeding would have been different. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus.

{¶ 46} Turner's ineffective-assistance claim is based on a false premise. Contrary to Turner's argument, purpose to kill *is* an essential element of attempted murder under Virginia law. The Virginia Supreme Court has held: "To sustain a conviction of an attempted crime, the evidence must establish a specific intent to commit the crime * * *." *Howard v. Commonwealth* (1981), 221 Va. 904, 906, 275 S.E.2d 602.

{¶ 47} Accordingly, in order to sustain a conviction of attempted murder, the evidence must establish a specific intent to kill, as the Virginia Supreme Court has held. "[A]ttempted murder requires proof of an intent to kill * * *." *Martin v. Commonwealth* (1991), 242 Va. 1, 5, 406 S.E.2d 15. "[I]n order to prove the crime of attempted murder, the evidence must show a specific intent to kill the victim * * * coupled with some overt but ineffectual act in furtherance of this purpose." *Epps v. Commonwealth* (1975), 216 Va. 150, 156, 216 S.E.2d 64. See, also, *Coleman v. Commonwealth* (2001), 261 Va. 196, 200, 539 S.E.2d 732; *Nobles v. Commonwealth* (1977), 218 Va. 548, 551, 238 S.E.2d 808; *Hargrave v. Commonwealth* (1974), 214 Va. 436, 437, 201 S.E.2d 597; *Thacker v. Commonwealth* (1922), 134 Va. 767, 770–772, 114 S.E. 504. Turner cites no Virginia case holding that a defendant may be convicted of attempted murder *without* proof of specific intent to kill. Moreover, Turner has not demonstrated either that counsel performed in a deficient manner in this connection or that the outcome of the proceedings would have been different but for the action of his counsel. Turner's fourth proposition of law is accordingly overruled.

### B. Course–of–Conduct Specification

{¶ 48} In his third proposition of law, Turner argues that the stipulated facts "do not conclusively establish that the killing of Ronald Seggerman was purposeful" and hence do not establish his guilt of the course-of-conduct specification, which requires proof of a course of conduct involving two or more *purposeful* killings. See R.C. 2929.04(A)(5). Turner contends that his trial counsel rendered ineffective assistance by failing to contest the state's allegation of purpose.

{¶ 49} However, the stipulated facts are clearly sufficient to permit the panel to find, beyond a reasonable doubt, that Turner purposefully killed Seggerman. Turner's argument to the contrary is not well taken. Turner claims that "Seggerman was the aggressor" because Seggerman ran toward Turner with a weapon in his hand. But Turner admitted to police that, as Seggerman approached, he ran toward Seggerman, disabled him by throwing gasoline in his face, and beat him. Turner further admitted that he "probably" had a knife and that Seggerman dropped his weapon in the parking lot. According to Jennifer's neighbor, John Myers, Turner then forced Seggerman to back up approximately 100 yards. Myers next saw Turner make several downward thrusting motions with his knife. The autopsy showed that Seggerman had at least four wounds, one of which punctured his lung.

{¶ 50} Turner's repeated stabbing of Seggerman indicates Turner's intent to kill. See, e.g., *State v. Tibbetts* (2001), 92 Ohio St.3d 146, 162, 749 N.E.2d 226; *State v. Burke* (1995), 73 Ohio St.3d 399, 404, 653 N.E.2d 242. So does Turner's use of a deadly weapon. See, e.g., *State v. Dunlap* (1995), 73 Ohio St.3d 308, 316, 652 N.E.2d 988. And so does the infliction of a wound in a vital area of

Seggerman's body. See, e.g., *State v. Clark* (1988), 38 Ohio St.3d 252, 256, 527 N.E.2d 844.

{¶ 51} The stipulated facts establish Turner's purpose to kill. Hence, we cannot conclude that Turner's counsel provided ineffective assistance simply because they did not argue otherwise. Accordingly, Turner's third proposition of law is overruled.

## IV. Sufficiency of Evidence

{¶ 52} In his fifth proposition of law, Turner contends that the panel's findings of guilty as to the death specifications are not supported by sufficient evidence.

{¶ 53} As to the R.C. 2929.04(A)(8) witness-murder specification, Turner contends that the state failed to show that Jennifer Turner had ever given testimony in any criminal proceeding. Therefore, according to Turner, he cannot be convicted of having killed her "in retaliation for [her] testimony in any criminal proceeding." R.C. 2929.04(A)(8).

{¶ 54} However, in *State v. Filiaggi* (1999), 86 Ohio St.3d 230, 248, 714 N.E.2d 867, we interpreted the term "testimony in any criminal proceeding" to include the filing of a complaint accusing another of a criminal offense. "We find that the state presented sufficient evidence to prove that the filing of these complaints was one of the reasons that defendant killed [the victim]. * * * [T]he evidence also supports the theory that defendant killed [the victim] *in retaliation* for her testimony in a criminal proceeding, *i.e.,* the bringing of the complaint." (Emphasis sic.) Id.

{¶ 55} The stipulations here show that in March, April, and May 2001, Jennifer Turner filed criminal complaints against Turner. Under *Filiaggi,* the filing of those complaints constituted "testimony in any criminal proceeding." Id. Therefore, because Turner killed Jennifer in retaliation for filing the complaints, the court properly convicted him of the R.C. 2929.04(A)(8) witness-murder specification.

{¶ 56} The evidence supports a finding that Turner killed Jennifer in retaliation for filing the complaints. On May 26, 2001, the day after Jennifer filed a telephone-harassment complaint against Turner, Turner told a co-worker of his anger at her both for filing the harassment complaint and for having him arrested for violating the TPO that stemmed from her previous complaints. Turner outlined his plans to "kill the bitch." About two weeks later, Turner also told a bartender that he intended to "kill [his] wife" because "she took [him] to court for harassment." On June 12, before going to kill Jennifer, Turner equipped himself in accordance with the plan he had outlined to his co-worker on May 26. This evidence supports a finding that Turner killed Jennifer because she had filed these complaints against him.

{¶ 57} As to the R.C. 2929.04(A)(5) course-of-conduct specification, Turner contends that the stipulated facts are insufficient to prove that he *purposefully* killed Ronald Seggerman and therefore to prove that he purposefully killed two or more persons. We disagree. After disabling and disarming Seggerman, Turner beat him, forced him to back up 100 yards, then stabbed him at least four times. As we said in discussing Turner's third proposition, these facts are sufficient to permit a finding that Turner harbored a purpose to kill.

{¶ 58} Finally, Turner argues that the state did not prove the prior-conviction R.C. 2929.04(A)(5) specification because the state offered no evidence "that Virginia's attempted murder statute contained the requisite language," nor did the state offer any evidence, such as a journal entry, to prove the fact of conviction. We have already addressed part of this argument in discussing Turner's fourth proposition of law. Virginia's courts have held that an attempted-murder conviction requires proof of specific intent to kill.

{¶ 59} Furthermore, the prosecutor had no burden to prove the content of the Virginia statute. The content of a sister state's statute is a question of law, not a question of fact. A court "in taking judicial notice of the decisional [or] * * * public statutory law * * *of any other state * * * of the United States may inform itself in such manner as it deems proper * * *. The court's determination shall be treated as a ruling on a question of law * * *." Civ.R. 44.1(A)(3). This rule applies in criminal cases by virtue of Crim.R. 27. See, generally, 2 McCormick, Evidence (5th Ed.Strong Ed.1999) 397–398, Section 335; Mueller & Kirkpatrick, Modern Evidence (1995) 161–162, Section 2.12.

{¶ 60} Nor was it necessary for the state to introduce a journal entry to prove Turner's prior conviction. Turner stipulated that he had been convicted of attempted murder in Virginia. That stipulation became part of the evidence in this case and rendered further proof unnecessary.

{¶ 61} Turner's fifth proposition of law is overruled.

## V. Merger of Specifications

{¶ 62} Each aggravated-murder count in the indictment included two specifications under R.C. 2929.04(A)(5): a course-of-conduct specification and a prior-conviction specification. In his sixth proposition of law, Turner contends that the (A)(5) specifications should have been merged into a single (A)(5) specification. See, generally, *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph five of the syllabus: "In the penalty phase of a capital prosecution, where two or more aggravating circumstances arise from the same act or indivisible course of conduct and are thus duplicative, the duplicative aggravating circumstances will be merged for purposes of sentencing."

{¶ 63} Turner waived this issue at trial, inasmuch as he never requested that the trial court merge the (A)(5) specifications. See *State v. Cook* (1992), 65 Ohio St.3d 516, 528, 605 N.E.2d 70. We do not find plain error. See *State v. Barnes* (2002), 94 Ohio St.3d 21, 27, 759 N.E.2d 1240. Turner's sixth proposition is therefore overruled.

## VI. Settled Issues

{¶ 64} In his seventh proposition of law, Turner attacks the constitutionality of the death penalty and the Ohio statutes governing its imposition. These claims have all been repeatedly rejected, and we overrule them summarily here. See *State v. Jenkins*, 15 Ohio St.3d at 167–171, 173–177, 15 OBR 311, 473 N.E.2d 264; *State v. Mapes* (1985), 19 Ohio St.3d 108, 116–117, 19 OBR 318, 484 N.E.2d 140; *State v. Buell* (1986), 22 Ohio St.3d 124, 137–138, 22 OBR 203, 489 N.E.2d 795; *State v. Steffen* (1987), 31 Ohio St.3d 111, 124–125, 31 OBR 273, 509 N.E.2d 383; *State v. Durr* (1991), 58 Ohio St.3d 86, 97, 568 N.E.2d 674; *State v. Mills* (1992), 62 Ohio St.3d 357, 371–372, 582 N.E.2d 972; *State v. Lorraine* (1993), 66 Ohio St.3d 414, 426, 613 N.E.2d 212; *State v. Phillips* (1995), 74 Ohio St.3d 72, 101, 103–104, 656 N.E.2d 643.

## VII. Independent Sentence Review

{¶ 65} Under R.C. 2929.05(A), we must determine whether the evidence supports the panel's finding of aggravating circumstances, whether the aggravating circumstances outweigh the mitigating factors, and whether the death sentence is proportionate to sentences affirmed in similar cases.

{¶ 66} Turner pleaded guilty to three aggravating circumstances with respect to the aggravated murder of Jennifer Turner.[2] Under R.C. 2929.04(A)(8), the three-judge panel found that Jennifer was murdered in retaliation for her testimony in a criminal proceeding. Under R.C. 2929.04(A)(5), the panel found that the murder was part of a course of conduct involving two or more intentional killings committed by Turner. And also under R.C. 2929.04(A)(5), the panel found that Turner had been previously convicted in Virginia of attempted murder, an offense of which the specific purpose to kill was an essential element.

{¶ 67} The stipulated facts, along with the exhibits introduced at the plea hearing, are sufficient to permit a finding that the specified aggravating circumstances exist.

---

2. The trial court merged the two aggravated-murder counts into one for sentencing—erroneously, as the two counts involved different victims. See *State v. Jones* (1985), 18 Ohio St.3d 116, 118, 18 OBR 148, 480 N.E.2d 408. However, the state did not object to this merger at trial and has not cross-appealed from the trial court's judgment. Hence, there is only one death sentence before us.

{¶ 68} At the sentencing hearing, Turner made an unsworn statement and presented three witnesses: Reva Turner, his mother; Brandie Fox, his daughter; and Dr. Kristen Haskins, a psychologist.

{¶ 69} Turner was born in 1958 in Bassett, Virginia. In his childhood, Turner was a Boy Scout, attended church, and participated in youth activities. In his unsworn statement, Turner said that he was sexually molested by a sitter at age 6 or 7. As a teenager, Turner began a lifelong drinking habit. At age 16, as soon as he could legally drop out of school, he did.

{¶ 70} At 17, Turner fell in love. His girlfriend, Paula, was pregnant by someone else when they began dating, but Turner wanted to marry her. Paula's daughter, Brandie, was born in 1977. Uncertain that he could handle marriage and fatherhood, Turner joined the Navy. After basic training, however, he came home on leave and married Paula.

{¶ 71} Continuing his naval service, Turner trained as an electrician and sent most of his pay home to Paula. However, he also drank more heavily than ever and began using drugs. Turner missed Paula and Brandie intensely. He obtained his discharge and went back to Virginia.

{¶ 72} Turner's marriage to Paula lasted 19 years. Brandie testified that Turner had always been a loving father to her, never drank in her presence during her childhood, and never struck her or Paula.

{¶ 73} After leaving the Navy, Turner got a job on a garbage truck but lost it after resuming his drug and alcohol habits. He found another job but got laid off, and he lost a third job due to drunkenness. Turner then began burglarizing houses.

{¶ 74} In 1980, Virginia police arrested Turner for larceny and breaking and entering. While in custody, he tried to kill a deputy sheriff with a letter opener. He pleaded guilty to attempted murder, received a 15-year sentence, and served five years before being paroled.

{¶ 75} Turner initially adjusted poorly to prison: he received discipline twice for refusing to work. But he claims that he "straightened up" and had no further problems. He earned an assignment to the honor dormitory at two different institutions and received "30–30 good time," a 30-day sentence reduction for every 30 days served. Officials permitted him to work unsupervised outside the fence on a prison farm. He also worked as a cook in the prison kitchen. He obtained a GED and took courses in air conditioning, refrigeration, electronics, and business management.

{¶ 76} During Turner's incarceration, Paula had a son by another man. However, she visited Turner regularly in prison, and they maintained their

relationship. Upon being paroled, he returned to Paula and accepted her son as his own.

{¶ 77} After his release, Turner got a job and bought a small farm. For five years, he managed to stay out of prison. However, he resumed drinking and using cocaine. Then he agreed to drive a stolen car from Virginia to South Carolina. Authorities arrested Turner and returned him to prison for violating parole.

{¶ 78} In prison, Turner behaved himself, lived in the honor dormitory, and earned privileges and 30–30 good time. He "got saved" and studied the Bible. He attended cooking school and later taught cooking to other inmates. His parents, wife, and children made frequent visits.

{¶ 79} Some years later, officials again placed him on parole. He resumed drinking, behavior that finally caused Paula to divorce him. Then he began smoking crack cocaine. He lost his job but was rehired after he entered a drug rehabilitation program. Then he resumed his drug habit and was fired yet again.

{¶ 80} Turner found work at a furniture factory. It was there that he met Jennifer Lyles. After living together for a year, Turner and Jennifer were married on January 29, 2000. Jennifer was required to pay child support, but often fell into arrears, and on several occasions, Turner helped her comply with the court's orders.

{¶ 81} In 2000, around the time Jennifer moved to the Columbus area, Turner's father was diagnosed as having a brain tumor. Turner's mother needed help caring for her husband, so Turner moved in with his parents for several weeks to help.

{¶ 82} On December 20, 2000, Turner followed Jennifer to the Columbus area. He obtained a job and ultimately moved into her apartment. However, his father's death on January 21, 2001, deeply upset him. He and Jennifer drank "all the time." Eventually, according to Turner, Jennifer "kicked [him] out." Turner claimed he "couldn't figure out what was wrong." He became intensely depressed, drank heavily, and began smoking crack again.

{¶ 83} Finally, Turner made a plan to "get [Jennifer] back or die trying." He obtained rope, duct tape, chains, a padlock, a hammer, screwdrivers, gasoline, and knives. He planned to "get in the apartment and make her listen," believing that she would make up with him if he could talk to her. However, Turner "didn't think [he] could live without" Jennifer. If Jennifer refused to reconcile with him, he intended to tie her up and set them both on fire "so [they] would die together."

{¶ 84} Turner told the panel that on the day of the murders, he smoked crack and drank heavily. During the week preceding, he had been drinking and smoking crack daily, and he "hadn't slept in days."

{¶ 85} Turner told the panel that when he arrived at the parking lot across from Jennifer's apartment, he sat in the nearby trees and drank until he passed out. He claimed that he prepared to leave after he woke up. Then, he claimed, Seggerman ran toward him carrying a weapon, cursing and threatening to "kick [Turner's] ass." Turner claimed that this behavior frightened him, so he threw gasoline on Seggerman "and [they] started fighting." According to Turner, he "blacked out" after the affray began and "[t]he next thing [he] knew, the police [were] arresting [him]." Nonetheless, he admitted responsibility for the murders.

{¶ 86} Dr. Haskins testified that Turner's thought processes and thought content are "reasonably normal," with no delusions. He has no "major mental disorder" and is not a psychopath. He is "able to think in a logical, clear, goal-directed * * * fashion." His intelligence is average; his memory, attention, and concentration are reasonably good. However, Turner sometimes suffers from depression and anxiety and has "obsessive-compulsive" features in his personality. Haskins believed that he was obsessed with Jennifer.

{¶ 87} Haskins evaluated Turner on the Hare Psychopathy Checklist–Revised (PCL–R), "a rating scale designed to measure traits of psychopathic personality disorder." According to Haskins, 80 percent of male prison inmates display more symptoms of psychopathy than Turner. Furthermore, 91 percent have worse PCL–R Factor 2 scores than does Turner; Factor 2 measures "chronically unstable, antisocial and socially deviant lifestyle" traits. Turner appeared to have an antisocial personality disorder, but Haskins was not certain.

{¶ 88} Haskins noted that Turner "lies a lot." For instance, he denied committing abuse in any relationship, including his relationship with Jennifer. Turner also told Haskins that he hears a voice commanding him "to do negative things," but he had never reported such hallucinations before, and Haskins did not believe him. Turner also exaggerated his symptoms on two psychological tests, although Haskins was not certain whether he did so intentionally.

{¶ 89} According to Haskins, Turner is cocaine-dependent and a chronic alcoholic. Aggression on his part has usually been linked to substance abuse. He responds positively to structure and to a setting where the availability of drugs and alcohol is reduced. He has not caused "major management problems" in jail while awaiting trial. Haskins expected that, if sentenced to life, Turner "would do pretty much as he's done before." Turner expressed remorse for the murders, and Haskins believed his remorse to be genuine.

{¶ 90} Under R.C. 2929.04(B), we must consider the nature and circumstances of the offense, the history, character, and background of the offender, and the mitigating circumstances set forth in R.C. 2929.04(B)(1) through (7).

{¶ 91} Turner did not attempt to establish the existence of any mitigating factors under R.C. 2929.04(B)(2) through (6). However, at the sentencing hearing, Turner argued that Seggerman "induced or facilitated" his own murder, R.C. 2929.04(B)(1), by approaching Turner with a weapon. Given Turner's history of assaulting Jennifer, we cannot agree. Cf. *State v. Clark* (1988), 38 Ohio St.3d 252, 263, 527 N.E.2d 844 (victim does not induce or facilitate his own murder by resisting an armed robbery). We find, therefore, that Turner has failed to establish the existence of a mitigating factor under R.C. 2929.04(B)(1).

{¶ 92} We find very little mitigating value in the nature and circumstances of the offense. Turner decided to kill Jennifer more than two weeks before the murders. His motives included revenge. When Seggerman confronted him, Turner rendered Seggerman helpless by throwing gasoline in his face. Then he forced the disarmed Seggerman to back up 100 yards before killing him at Jennifer's front door with at least four knife wounds. As Jennifer screamed for mercy, he stabbed her 11 times.

{¶ 93} Although Turner's account of the murders indicates that he may have been intoxicated when he committed them, "[v]oluntary intoxication is at most a weak mitigating factor, entitled to little weight." *Fitzpatrick*, 102 Ohio St.3d 321, 2004-Ohio-3167, 810 N.E.2d 927, ¶ 111. In this case, Turner's advance preparations suggest that intoxication had little, if anything, to do with these murders.

{¶ 94} Turner's claim to have blacked out just before stabbing the victims to death is not credible. He never made any such claim in his statements to the police or to his fellow inmates. Indeed, the story he told police was inconsistent with his having blacked out. He claimed to recall that Jennifer tried to break up the fight between him and Seggerman.

{¶ 95} Turner also claims to have committed the murders in a state of emotional distress. But Turner's emotional state carries little, if any, weight. Turner murdered his wife as a planned act of revenge, and the evidence demonstrates that both murders were committed with prior calculation and design. Moreover, the fact that Jennifer's murder stemmed from Turner's relationship with her is not entitled to mitigating weight. See *State v. O'Neal* (2000), 87 Ohio St.3d 402, 421, 721 N.E.2d 73 (rejecting claim that aggravated murder of defendant's wife was less deserving of death because it stemmed from a domestic dispute).

{¶ 96} Finally, Turner claimed in his unsworn statement that he feared Seggerman. But fear does not reasonably explain why Turner stabbed Seggerman *after* disabling him, disarming him, and forcing him to back up 100 yards from the parking lot where Seggerman had dropped his weapon.

{¶ 97} Defense counsel argued at trial that a death sentence is not needed to protect society because Turner is less violent and antisocial than many other

criminals in prison. This factor is supported by Turner's relatively low PCL–R scores and his record in the Virginia prison system. Yet the weight of this factor is substantially diminished by the circumstances surrounding Turner's attempted-murder conviction. Turner was in the custody of a deputy sheriff in 1980 when he attempted to murder the deputy. He somehow obtained a letter opener and held it to the deputy's throat; when the deputy tried to take the letter opener, Turner attempted to stab him.

{¶ 98} Turner does appear to have been a good father and a devoted son. He helped his mother care for his father during the latter's final illness. He clearly has the continuing love and support of his mother and of Brandie. When out of prison, Turner usually found employment and supported himself. While incarcerated, he studied electronics, business management, and cooking. These facts have some weight as mitigating factors.

{¶ 99} We have held that "retrospective remorse" deserves little weight in mitigation. *State v. Wiles* (1991), 59 Ohio St.3d 71, 93, 571 N.E.2d 97. Nevertheless, Turner's decision to plead guilty also deserves some weight. But this circumstance is offset to a degree by Turner's claims of blacking out and hearing voices, which can be interpreted as attempts to avoid responsibility.

{¶ 100} To affirm the death sentence, we must conclude beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors. We find that the three aggravating circumstances attached to Jennifer Turner's murder are extremely grave. In particular, the R.C. 2929.04(A)(8) witness-murder specification is entitled to great weight, for it "strikes at the heart of the criminal justice system." *State v. Jalowiec* (2001), 91 Ohio St.3d 220, 239, 744 N.E.2d 163. Moreover, Turner has both a prior-conviction and a course-of-conduct specification. Twenty years after being convicted of attempted murder, he killed two people. These aggravating circumstances are entitled to great weight as well. We find that the combined aggravating circumstances outweigh the mitigating factors in this case beyond a reasonable doubt.

{¶ 101} **Proportionality:** Turner's death sentence is proportionate to death sentences approved in similar cases. We have approved death sentences in cases where the witness-murder specification was present alone or in combination with one other specification, even when substantial mitigation existed. *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 174; *State v. Coleman* (1999), 85 Ohio St.3d 129, 144, 707 N.E.2d 476; *Jalowiec*, 91 Ohio St.3d at 240, 744 N.E.2d 163; *State v. Smith* (2000), 87 Ohio St.3d 424, 447, 721 N.E.2d 93.

{¶ 102} We have also approved death sentences in cases where the defendant had a conviction described in R.C. 2929.04(B)(5), see *State v. Taylor* (1997), 78 Ohio St.3d 15, 33, 676 N.E.2d 82, and in cases presenting a course of conduct

involving two murders, see *State v. Awkal* (1996), 76 Ohio St.3d 324, 338, 667 N.E.2d 960; *State v. Braden,* 98 Ohio St.3d 354, 2003-Ohio-1325, 785 N.E.2d 439, ¶ 128. Finally, we approved the death sentence in *O'Neal,* 87 Ohio St.3d at 421, 721 N.E.2d 73, where the defendant murdered his estranged wife during an aggravated burglary. Having completed our proportionality review, we find no reason to change the sentences.

{¶ 103} Turner's convictions and sentence of death are therefore affirmed.

Judgment affirmed.

MOYER, C.J., RESNICK, PFEIFER, LUNDBERG STRATTON, O'CONNOR and LANZINGER, JJ., concur.

---

Ron O'Brien, Franklin County Prosecuting Attorney, and Steven L. Taylor and Heather R. Saling, Assistant Prosecuting Attorneys, for appellee.

W. Joseph Edwards and Todd W. Barstow, for appellant.