JOURNAL ENTRY and OPINION
{¶ 1} Appellant John Pudelski appeals the decision of the trial court dismissing his petition to vacate or set aside judgment and/or sentence pursuant to R.C. 2953.21 and 2953.23.
 {¶ 2} Pudelski was convicted of the murder of his infant daughter, Ellie Marie Pudelski, and sentenced to a term of fifteen years to life on September 19, 1999. This court affirmed his conviction and sentence in State v. Pudelski (March 15, 2001), Cuyahoga App. No. 77172. Pudelski filed an initial motion for postconviction relief on April 23, 2003, which was denied on September 15, 2003 by the trial court; however, because the trial court failed to issue findings of fact and conclusions of law, Pudelski's initial postconviction appeal was dismissed. Subsequently, the matters were refiled in the trial court, and the trial court again dismissed the postconviction petition, this time adopting the state's findings of fact and conclusions of law on February 26, 2005, resulting in the current appeal.
 {¶ 3} Pudelski also filed a writ of habeas corpus pursuant to Section 28 U.S.C.A. 2254 in United States District Court for the Northern District of Ohio. This writ was dismissed on March 18, 2003 to allow Pudelski to exhaust available state remedies.
 {¶ 4} The facts of Pudelski's underlying conviction were outlined by this court in the direct appeal in State v.Pudelski (March 15, 2001), Cuyahoga App. No. 77172, and are restated here for clarity.
 {¶ 5} "Appellant John J. Pudelski was charged in a two-count indictment filed April 14, 1999. Count one charged him with aggravated murder in violation of R.C. 2903.01 specifically, purposely causing the death of his infant daughter, Ellie Marie Pudelski. Count two charged him with murder; that is, causing the infant's death as a proximate result of committing or attempting to commit felonious assault, a first or second degree felony that is an offense of violence.
 {¶ 6} "Appellant moved the court to suppress oral statements he made to the police, to dismiss the death penalty specification on count one, and to dismiss the murder charge contained in count two of the indictment. After a hearing on the motion to suppress, the court denied all three motions. However, the state was given leave to remove the death penalty specification from the indictment on July 23, 1999.
 {¶ 7} "The case proceeded to trial on August 23, 1999. In addition to the charges of murder and aggravated murder, the jury was also instructed on the lesser included offense of involuntary manslaughter as a proximate result of child endangering. The jury returned a verdict finding appellant not guilty of aggravated murder but guilty of murder. The court sentenced him to fifteen years' to life imprisonment and overruled his motions for acquittal and for a new trial. Appellant timely appealed his conviction and the denial of his post-verdict motions.
 {¶ 8} "In the state's case at trial, the jury heard testimony from appellant's wife (who was also the mother of the infant victim), medical personnel involved in the delivery and postnatal care of the infant, paramedic and emergency room personnel who responded to the 9-1-1 call regarding the child's death, the county coroner and assistant coroner, and a police officer who investigated the matter.
 {¶ 9} "The mother testified that the infant girl was delivered by Caesarian section on March 17, 1999, and she took her home four days later. The infant fed every four hours, approximately two and one-half to three ounces of formula or breast milk at each feeding, and behaved normally. The mother never noticed any injury to the infant's head.
 {¶ 10} "The neonatologist who was present at the infant's birth had noted a caput or bruise under the scalp but above the skull bone on the back of her head. This is a common injury in newborns and does not have any serious effects on the infant's health. A pediatrician who saw the infant on March 18 and 20 reported that he saw no abnormalities. He would not necessarily have noted a caput in his records unless it was an unusual one. He did not note one here. Neither physician noted any cephalohematoma, or swelling and bleeding of the tissue under the bone, which would have been a more serious injury. A home nurse reported that the baby appeared normal and had no bumps or bruises on her head when the nurse saw her on March 23.
 {¶ 11} "The mother testified that the baby behaved normally throughout the day of Sunday, March 28, 1999. The mother fed her at 8:00 or 9:00 p.m.; the baby consumed almost three and one-half ounces at that time. The mother put the baby to bed at approximately 9:30 p.m., then took a cough medication, Nyquil, and went to bed herself. The baby's crib was located in the mother's bedroom.
 {¶ 12} "The mother awakened around 12:00 midnight when the baby cried and got up to feed the child. Appellant, her husband, was not in the room when the mother awakened but came in and offered to feed the baby, although he normally went to bed at that time. This was the first time he had fed the baby; he normally paid no attention to her. The mother then went back to sleep.
 {¶ 13} "The mother awakened at 7:00 a.m. and was immediately concerned because the child had not awakened for her normal feeding at 4:00 a.m. She went to the crib and found the baby in a corner with her head against the bumper pad. Her forehead was cold. The mother picked the baby up and felt for a heart beat but felt none. She observed a lump on the side of the baby's head.
 {¶ 14} "The mother began to yell for appellant to wake up. It was unusual for appellant to be sleeping at this time; he was usually up at 6:30 a.m. Appellant jumped up and took the baby from the mother and left the room, returning with the telephone. He ordered the mother to leave the bedroom and wait in the living room for paramedics to arrive.
 {¶ 15} "Paramedics came and took the baby to Euclid Hospital. Appellant and his wife delayed going to the hospital while appellant woke his two daughters from a prior marriage and readied them for school, then took them to his mother's house. Appellant and his wife proceeded from there to the hospital.
 {¶ 16} "At the hospital, they learned that the baby was dead. They went into a room to see the body, but appellant would not look at her. As they waited in the grieving room for the mother's mother to arrive, appellant said to his wife, Please don't leave me.
 {¶ 17} "The coroner and assistant coroner testified that the baby died as a result of a cerebral edema, or swelling of the brain, which was caused by a blunt impact that also caused a fracture of the skull. They estimated the time of death at approximately 3:00 a.m., and approximately two to three hours after the injury was inflicted. They opined that she was injured after her midnight feeding. The assistant coroner testified that the child would have survived if medical attention had been sought immediately after the injury occurred.
 {¶ 18} "The coroner and assistant coroner both opined that the fracture occurred very recently, certainly less than twenty-four hours before the baby's death. There were no signs of healing around it; the edges of the break were sharp and uncalloused and there was fresh blood at the site. There were no macrophages (clean-up cells) at the site of the fracture, though there were some in the adjacent scalp. They opined that these macrophages were present because of the caput that occurred at birth. There was no evidence the fracture was a new break at the same site as a fracture that had occurred earlier. Macrophages would have been present at the fracture site if the fracture were not new. The fracture could not have occurred after death because the body had to have been alive to pump the fresh blood that had oozed around the area.
 {¶ 19} "The coroner opined that the death was a homicide. She reached this conclusion because the child had a fracture that was not a birth injury, she could not have caused the fracture herself, and nothing accidental had happened, so the injury had to have been inflicted.
 {¶ 20} "Detective Raymond Jorz testified that appellant and his wife came in to the police station together voluntarily on March 31, 1999, and were interviewed separately. Appellant was interviewed by Detective Jorz and Lieutenant Brooks. They asked appellant whether the baby had suffered any accidental injuries, and appellant said she had not. Appellant related that he had fed the baby around midnight and stayed up with her until approximately 1:30 a.m., then put her in her crib after she went to sleep. He went to bed himself and awakened at approximately 3:30 a.m., used the bathroom, then returned to bed. He did not check on the baby at that time. His wife woke him the following morning after she found the baby cold and unresponsive.
 {¶ 21} "When police informed appellant that the baby had a skull fracture, appellant suggested that the fracture was caused by the emergency medical technicians or that the coroner was examining the wrong child. He denied knowledge of any injury."State v. Pudelski (March 15, 2001), Cuyahoga App. No. 77172.
 {¶ 22} Pudelski raises four assignments of error. For the reasons outlined below, we reject Pudelski's claims and affirm the decision of the trial court dismissing Pudelski's postconviction motion.
 {¶ 23} Pudelski's assignments of error are listed as follows:
 {¶ 24} ". "Court below erred in dismissing Appellant's post conviction petition where appellant was denied due process of law when trial court refused to provide jury a microscope to view demonstrative slide evidence admitted at trial."
 {¶ 25} "I. "Court below erred in dismissing appellant's post conviction petition where appellant was denied effective assistance counsel [sic] when his counsel failed to object to the court's refusal to provide the jury a microscope to view demonstrative slide evidence admitted at trial and failed to properly appeal the issue."
 {¶ 26} "II. "The trial court erred in dismissing Appellant's post conviction petition on grounds of res judicata where appellant was represented by the same trial counsel and Appellant's motion to re-open was denied."
 {¶ 27} "V. "The trial court violated the Appellant's Fifth, Sixth and Fourteenth Amendment rights in dismissing Appellant's post conviction petition."
 {¶ 28} Because all of the assignments of error relate to the trial court's failure to provide the jury with a microscope to view evidentiary slides and defense counsel's failure to object to this fact or raise it on the initial appeal, the assignments of error will be addressed together.
 {¶ 29} We first note that the trial court found that Pudelski's petition was not timely filed. Further, we note that the trial court determined that the issues raised here are precluded by res judicata.
 {¶ 30} Pudelski filed his petition to vacate or set aside the judgment or sentence on April 21, 2003, more than two years after his conviction and long after the one hundred and eighty days mandated by R.C. 2953.23(A)(1) and (2). In addition, while Pudelski claims he was unfairly prejudiced by having the same counsel at trial and on appeal, the fact remains that he filed a pro se application to reopen his appeal on November 6, 2001, in which he failed to raise the issue involving the trial court's decision to preclude the jury's use of a microscope.
 {¶ 31} It is well settled that the doctrine of res judicata applies in postconviction relief proceedings. "Under the doctrine of res judicata, a final judgment of conviction bars a convicted defendant who was represented by counsel from raising and litigating in any proceeding except an appeal from that judgment, any defense or any claimed lack of due process that was raised or could have been raised by the defendant at the trial, which resulted in that judgment or conviction, or on an appeal from that judgment." State v. Cole (1982), 2 Ohio St.3d 112, 113, citing State v. Perry (1967), 10 Ohio St.2d 175, paragraph nine of the syllabus. (Emphasis omitted.)
 {¶ 32} Pudelski correctly points out that because he was represented by the same counsel at trial and on direct appeal, res judicata would not act as a bar to raising a claim of ineffective assistance of counsel in a subsequent postconviction proceeding. See State v. Lentz (1994), 70 Ohio St.3d 527, 529. However, "[o]nce ineffective assistance of counsel has been raised and adjudicated, res judicata bars its relitigation."State v. Cheren, 73 Ohio St.3d 137, 138, 1995-Ohio-28. Although Pudelski failed to raise the issue of ineffective assistance of counsel in his pro se application to reopen his appeal, he argues that his application was dismissed and the issue was never adjudicated. Even if we were to accept Pudelski's argument about res judicata, we can find no error in the trial court's determination of Pudelski's claims. Not only was the petition untimely, but, also, the claims fail on the merits. In the interests of justice, we will address the core of Pudelski's claim that his counsel was ineffective and the trial court committed error in not providing the jury with a microscope during deliberations. The facts shaping the trial court's determination are outlined as follows:
 {¶ 33} At trial, during jury deliberations, the jury sought use of a microscope to view tissue sample slides of the victim that had been marked and admitted into evidence. To be viewed, the slides required the use of a large, unique microscope that was not readily available.
 {¶ 34} The jurors, through the foreperson, submitted two written requests on the issue to the trial court. The questions, as quoted in the appellant's brief from the transcript, are as follows:
 {¶ 35} "I received the following message from the jury, and I quote, we are requesting, with your permission, a microscope to view the slide evidence period. Thanking you in advance for your time and cooperation."
 {¶ 36} "The court has another message, which I will read, that the slides were admitted into evidence, and the questions that the foreman asks, and it's a valid question, is how are we to view these, and he adds we have a trained and certified microbiologist among us."
 {¶ 37} At trial, in an effort to avoid the appearance of prejudice to either side, both the prosecutor and counsel for the defendant agreed to allow the court to address this issue. Thus responsibility for denying the jury the use of the microscope was focused on the trial court rather than on the parties.
 {¶ 38} The trial court informed the jury on the record that it denied the jury a microscope in part because the jury indicated in the second note that the jury had a "trained and certified microbiologist among us." The court, in part, told the jury: "Now, frankly, that's one of the reasons that I'm declining to produce this microscope. Because the jury is the jury. And the jury is not an expert, per se."
 {¶ 39} The court added: "So what does the jury have in this case? It has the expert testimony of, I believe, six experts on various points. The jury has its collective recollection, and although the notes are not evidence, the notes have a value to assist the jury in recalling its recollection of the evidence." These facts demonstrate the court was legitimately concerned about the jury taking on an investigatory role. Ohio law precludes independent investigations by jurors. R.C. 2945.79 (A) and (B) expressly outline juror misconduct as a reason for a new trial:
 {¶ 40} "(A) Irregularity in the proceedings of the court,jury, prosecuting attorney, or the witnesses for the state, or for any order of the court, or abuse of discretion by which the defendant was prevented from having a fair trial;
 {¶ 41} "(B) Misconduct of the jury, prosecuting attorney, or the witnesses for the state[.]" (Emphasis added.)
 {¶ 42} In analyzing a case of alleged juror misconduct, a trial court would have to engage in a two-tier inquiry. First, it would have to determine whether juror misconduct occurred. If so, it would then have to determine if the misconduct materially affected the defendant's substantial rights. State v. Jerido,
(Feb. 26, 1998), Cuyahoga App. No. 72327. Further, OJI Section 402.21 recommends the following instruction involving investigation by the jurors to avoid the risk of misconduct:
 {¶ 43} "WARNING. You may not investigate or attempt to obtain additional information on this case outside the courtroom. It is highly improper for anyone of you to attempt to do so."
 {¶ 44} Here, the trial court was properly precluding the jury from conducting an improper investigation. The record reveals that there were other grounds stated for the court's concern. On the record, the prosecutor noted that the slides in question did not have identifiable marks that would orient a viewer as to what was being observed. The prosecutor outlined this problem:
 {¶ 45} "Judge, it's the understanding of the state that nowhere on any of the slides is the orientation reflected so that even a physician would have trouble recognizing what portion of the body you are looking at."
 {¶ 46} In light of the fact that the slides were presented and testified to by an expert, the jury had the evidence before them to consider. Allowing the jurors to conduct an independent investigation in the jury room with a "trained and certified microbiologist" could have so tainted the expert's testimony and prejudiced the role of the jury that the trial court's decision to preclude the use of a microscope was not error.
 {¶ 47} Pudelski's reliance on State v. Crimi (1995),106 Ohio App.3d 13, for the proposition that the jury should have been provided a microscope is unpersuasive. Crimi involved a jury request to review the videotape of a police chase. Images of a police chase are well within the understanding of a lay person acting as a juror. Reviewing videotape images is in stark contrast to conducting scientific investigations involving autopsy slides in the jury room.
 {¶ 48} Pudelski also asserts counsel was ineffective for failing to object to the trial court's ruling denying use of the microscope. In evaluating whether a defendant has been denied his Sixth Amendment right to effective assistance of counsel, the ultimate query is "whether the accused, under all the circumstances, * * * had a fair trial and substantial justice was done." State v. Hester (1976), 45 Ohio St.2d 71, paragraph four of the syllabus. Moreover, in order to prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that his counsel performed deficiently and that he suffered prejudice from the deficiency. State v. Turner,105 Ohio St.3d 331, 338, 2005-Ohio-1938. "Deficient performance consists of falling below an objective standard of reasonable representation; to prove prejudice, a defendant must demonstrate that, but for counsel's errors, the result of the proceeding would have been different." Id., citing Strickland v. Washington (1984),466 U.S. 668, 687; State v. Bradley (1989), 42 Ohio St.3d 136, paragraph two of the syllabus.
 {¶ 49} Judicial scrutiny of defense counsel's performance must be highly deferential. Strickland, 466 U.S. at 689. In Ohio, there is a presumption that a properly licensed attorney is competent and the defendant has the burden of proof to establish counsel's performance was deficient. State v. Calhoun,86 Ohio St.3d 279, 1999-Ohio-102. Further, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. Strickland, 466 U.S. at 690.
 {¶ 50} Here, it is clear that defense counsel understood the jury could not conduct an independent investigation. It was not error for defense counsel to fail to object to something that would be improper. A number of experts testified, and the trial court admitted a set of slides offered by the defense. It is apparent from the limited record before us that any examination of the slides would have to be considered in light of the accompanying expert testimony. For these reasons, we would overrule Pudelski's assignments of error and affirm the decision of the trial court.
Judgment affirmed.
It is ordered that appellee recover of appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Celebrezze, Jr., P.J., and Karpinski, J., concur.